**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

AHMED
ALAHMEDALABDALOKLAH,

*Defendant-Appellant*.

No. 18-10435

D.C. No.
2:12-cr-01263-
ROS-1

OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted February 6, 2023
Phoenix, Arizona

Filed August 9, 2023

Before: Susan P. Graber, Richard R. Clifton, and Morgan
Christen, Circuit Judges.

Opinion by Judge Christen

## SUMMARY[*]

### Criminal Law

The panel affirmed in part and reversed in part the conviction, after a jury trial, of Ahmed Alahmedalabdaloklah (Oklah), a Syrian national, for participating in a conspiracy that targeted U.S. military personnel and property in Iraq.

Reversing in part, the panel agreed with the parties that Oklah's convictions on Counts Three and Four, for conspiring to possess a destructive device in furtherance of a crime of violence and aiding and abetting the same, could not stand after the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019). On those counts, the panel remanded with direction to the district court to vacate the convictions.

The panel affirmed Oklah's convictions on Counts One and Two, for conspiring to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a, and conspiring to damage U.S. Government property by means of an explosive, in violation of 18 U.S.C. § 844(f) and (n).

As to Count Two, the panel held that 18 U.S.C. § 844(f) and (n) applied to Oklah's extraterritorial conduct. The panel held that the presumption against extraterritoriality applies to criminal statutes as well as to civil statutes. Reconciling *United States v. Bowman,* 260 U.S. 94 (1922) (whether a criminal statute has extraterritorial reach

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

depends on the nature of the criminalized conduct and the interests the statute protects), with *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010), and *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016) (setting forth a two-step test for determining whether a statute applies extraterritorially), the panel held that a criminal statute applies extraterritorially when (1) a federal criminal offense directly harms the U.S. Government, and (2) enough foreseeable overseas applications existed at the time of the statute's enactment to warrant the inference that Congress both contemplated and authorized prosecutions for extraterritorial acts. The panel concluded that the text and context of § 844(f) and (n) provide a clear indication that they apply extraterritorially, including to Oklah, a foreign national. Accordingly, the presumption against extraterritoriality was rebutted.

The panel held that, during pretrial discovery, the district court properly exercised its discretion in granting the Government's motions to use the processes set forth in the Classified Information Procedures Act (CIPA) to withhold or "substitute" classified information from discovery. As recognized by Oklah, precedent foreclosed his argument that his constitutional rights were violated because he and his counsel were not present at several CIPA hearings and because his counsel was prohibited from sharing or discussing certain "Secret"-level documents with him. Having placed itself in defense counsels' shoes and examined the classified records in full, the panel concluded that the district court did not abuse its discretion in its CIPA rulings, and the panel confirmed that the withheld classified materials were either not discoverable, or were not relevant and helpful to Oklah's defense. The panel held that the district court also did not abuse its discretion by authorizing

the Government to turn over substitution statements to the defense in lieu of other discovery.

The panel concluded, however, that several of the Government's supporting declarations were insufficient to sustain its invocation of the state-secrets privilege because this privilege requires formal invocation, either by the head of the department that has control over the matter or by a minister who is the political head of the department. The panel excused the Government's failure to comply with the formal invocation requirement in this case because it would be of little or no benefit to remand for the purpose of having the department head agree that the disclosure of the classified information would pose a risk to national security.

The panel held that the use at trial of the overseas deposition testimony of Jamal Al-Dhari about Oklah's connection to the Iraqi Revolution Brigades did not violate Oklah's rights under the Confrontation Clause; the Supreme Court's rulings in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959); or the rule against the admission of hearsay evidence.

The panel held that the district court properly excluded, as hearsay, emails between FBI Special Agent Whitson and Al-Dhari.

The panel held that the district court properly admitted the testimony of Christopher Graham and refused to grant a mistrial or to strike Graham's expert testimony on the Government's physical evidence.

The panel held that the Government's failure to produce James Dempsey, a Department of Defense-affiliated

witness, at trial did not violate Oklah's constitutional rights to due and compulsory process.

The panel held that the district court's refusal to order the Government to search the entire Department of Defense for relevant documents was not error under *Brady*, which requires the Government to produce to the defense exculpatory or impeaching evidence in the prosecutor's possession.

The panel held that remand for resentencing was warranted because the parties agreed that the convictions on Counts Three and Four must be vacated, but the panel rejected Oklah's argument that the case should be reassigned to a different district judge on remand.

**COUNSEL**

Molly A. Karlin (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender; Federal Public Defender's Office, Phoenix, Arizona; Michael Tanaka, Law Office of Michael Tanaka, Los Angeles, California; for Defendant-Appellant.

Jeffrey M. Smith (argued), Appellate Counsel; Matthew G. Olsen, Assistant Attorney General for National Security; Gary M. Restaino, United States Attorney; National Security Division, United States Department of Justice, Washington, D.C.; David A. Pimsner and Bill C. Solomon, Assistant United States Attorneys; Krissa M. Lanham, Appellate Division Chief; United States Attorney's Office, Phoenix, Arizona; for Plaintiff-Appellee.

# OPINION

CHRISTEN, Circuit Judge:

Ahmed Alahmedalabdaloklah (Oklah), a Syrian national, appeals his conviction after a jury trial for participating in a conspiracy that targeted U.S. military personnel and property in Iraq.[1]  The Government alleged that Oklah applied his technical expertise to develop, manufacture, and supply electronic components for improvised explosive devices (IEDs) that a non-state militant group used against the U.S. military.   The Government's evidence included videotaped testimony from overseas depositions; emails exchanged among alleged co-conspirators; physical evidence collected from a facility apparently used to assemble electronic components and manufacture IEDs in Baghdad, including physical evidence bearing the defendant's fingerprints; and expert testimony from electrical engineers with specialized military training. The jury delivered a mixed verdict on the six-count indictment.  It convicted Oklah for conspiring to use a weapon of mass destruction (Count One), conspiring to damage U.S. government property (Count Two), and conspiring to possess a destructive device in furtherance of a crime of violence and aiding and abetting the same (Counts Three and Four).  The jury acquitted Oklah of conspiring to murder Americans (Count Five) and providing material support to terrorists (Count Six).

---

[1] The defendant has been known by many aliases, but counsel represented that her client goes by "Oklah."  Hence, we use "Oklah" throughout this opinion.

We agree with the parties that the convictions based on crime-of-violence conspiracy (Counts Three and Four) cannot stand after the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), and on those counts we remand with direction to the district court to vacate the convictions. Even reviewing the record cumulatively, this is the only error that warrants remand. This opinion addresses Oklah's remaining convictions for Counts One and Two: conspiracy to use a weapon of mass destruction and conspiracy to damage or destroy U.S. government property. We affirm the convictions on Counts One and Two, reverse the convictions on Counts Three and Four, and remand to the district court for resentencing.[2]

## Background

### I.   Arrest and Extradition

The Government alleged that, between January 2005 and July 2010, Oklah was a member of the 1920s Revolution Brigades, an insurgent group in Iraq that aimed to drive American military forces out of that country. Among other things, the Brigades allegedly planted IEDs that damaged property owned by the U.S. military and killed or injured American troops. According to the indictment, Oklah designed or created remote detonator switches for the IEDs. The Government presented extensive evidence that Oklah's fingerprints, personal identification documents, and other incriminating evidence were found at a location in Baghdad that served as a site for manufacturing IEDs. In 2006, Oklah left Iraq and moved to China. The Government alleged that,

---

[2] On remand, the district court is also directed to modify the judgment to reflect the correct statute of conviction for Count One, 18 U.S.C § 2332a(a)(1). The original judgment contains a typographical error and mistakenly reflects a conviction for 18 U.S.C § 2332(a)(1).

from there, Oklah continued to design and assist with the manufacture of IEDs until the Chinese government expelled him in 2010. At that point, Oklah traveled from China to Turkey, where he was arrested and eventually extradited to the United States.

Oklah was charged in the District of Arizona with six counts:

- Count One, conspiracy to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a(a)(1) and (3);

- Count Two, conspiracy to maliciously damage or destroy United States government property by means of an explosive, in violation of 18 U.S.C. § 844(f)(1), (2), and (n);

- Count Three, aiding and abetting possession of a destructive device in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A), (B)(ii), and (2);

- Count Four, conspiracy to possess a destructive device in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(o);

- Count Five, conspiracy to commit extraterritorial murder of a U.S. national, in violation of 18 U.S.C. § 2332(b)(2); and

- Count Six, providing material support to terrorists, in violation of 18 U.S.C. § 2339A.

## II.  Trial Evidence

Oklah's jury trial lasted for almost seven weeks, beginning on January 30, 2018, and continuing through March 16, 2018.

### A.  The Government's Case

An important and mostly undisputed aspect of the Government's case explained the history and activities of the 1920s Revolution Brigades, a group named after a 1920 Iraqi uprising in which tribal leader Suleiman Al-Dhari assassinated a British military officer.  The modern iteration of the Brigades arose after the 2003 Iraq War.  Its aim was to drive the U.S. military out of Iraq and to challenge the newly formed (and U.S.-supported) Iraqi government. Harith Al-Dhari (Harith) led the group until he was killed by Al-Qaeda in 2007.

A government witness testified that the Brigades differed from other insurgent groups because of their "laser like focus on expelling the Americans."  The group's tactics included using IEDs that were detonated remotely as military vehicles passed by.  The Government presented significant evidence about the transmitters and dual-tone multifrequency (DTMF) circuit boards that were used to trigger explosions. The Government's experts testified that, at some point, the Brigades split into factions, and some of them worked and operated in conjunction with the U.S. military, but the faction working with the U.S. military against Al-Qaeda did not use IEDs.

The Government argued that Oklah used his engineering expertise to create sophisticated IED components that the Brigades employed in their attacks against American forces in Iraq.  To prove Oklah's connection to the IED-related

activity, the Government introduced forensic evidence collected from what it characterized as one of the largest IED manufacturing facilities ever discovered in Iraq. Evidence tying Oklah to the Brigades' IED bombings was critical because Counts One and Two are both conspiracy charges. To tie Oklah to the Brigades, the Government relied on overseas deposition testimony from Harith's cousin Jamal Al-Dhari (Al-Dhari) and Muhammad Ali-Ways, the son-in-law of another Brigades leader, Abu Ghassan. The Government also introduced emails that Oklah exchanged with Al-Dhari and Ali-Ways, and evidence of Oklah's fingerprints on IED components of the same type the Brigades used in their IEDs. The emails and testimony connected Oklah not only to Al-Dhari and Ali-Ways, but also to Brigades military leaders Harith and Abu Ghassan. The Government argued that, while Oklah may have operated a legitimate electronics business as he claimed, he also sent IED components from China to Harith, to Abu Ghassan, and to other Brigades members in furtherance of the Brigades' campaign to drive Americans out of Iraq.

Al-Dhari, an Iraqi, moved to Lebanon in approximately 2005. When asked about the Brigades in the Government's case-in-chief, he readily affiliated himself with the group. He testified that his grandfather was the leader of the original Brigades and confirmed that the Brigades' "primary goal" was to "resist the American occupation" by "doing military operations." Al-Dhari admitted that he personally provided support for the medical, financial, logistical, and travel needs of Brigades members. According to Al-Dhari, on at least one occasion he provided financial assistance for Abu Ghassan, a Brigades member who had "knowledge and experience in . . . exploding devices and rockets." Al-Dhari admitted in his testimony that he provided support for the

Brigades inside and outside Iraq, but as discussed in additional detail below, Al-Dhari was equivocal when Government counsel asked him to describe his specific role and membership in the Brigades. Despite equivocal responses on these points, the Government ultimately acknowledged that Al-Dhari maintained a leadership position in the Brigades and had a military, political, and religious role in the group.

Al-Dhari identified Oklah as "Mukhtar" in his testimony, explaining that Al-Dhari's cousin, Harith, had introduced Oklah to him using that name. Al-Dhari described Oklah's work creating IED components for the Brigades, but the parties strongly dispute whether Al-Dhari had personal knowledge of Oklah's activities because Al-Dhari attributed some of his knowledge about "Mukhtar" to second-hand information he received from Harith. Al-Dhari testified that Harith told him that Oklah was helping the Brigades in the "technology aspect" with IEDs used against the American forces. Al-Dhari went on to testify that "Mukhtar" created remote controls for the IEDs, improved the devices, and helped thwart American countermeasures. When Government counsel asked Al-Dhari whether he had any conversations with Oklah about the IEDs, Al-Dhari responded that he did not understand the technology, but he knew "through general conversation with Harith that [Oklah] was helping in this matter."

The evidence showed that Al-Dhari had met Oklah in person, but the two communicated primarily by telephone and email. According to Al-Dhari's testimony, their correspondence stretched from 2004 to about 2009 or 2010. The Government used Al-Dhari to introduce several emails showing that Al-Dhari provided logistical support for Oklah and Brigades members and communicated with Oklah about

"the resistance" and shipments of IED parts. For example, in November 2008, Oklah emailed Al-Dhari about how to ensure that their cell phone communications were "protected from spying" when they discussed "the resistance." That same month, Oklah sent Al-Dhari an email indicating that he was sending 10 transmitters and 100 receivers from China to the Brigades. Al-Dhari explained that "the resistance w[as] in need for those devices, and they used to use them with bombs . . . to explode them through remote controls." He also testified about the significance of the ratio between transmitters and receivers, explaining, "[W]e don't need a lot of those transmitters but we will need more [of] those receivers . . . because those receivers, they get damaged with the bombs." Al-Dhari told the jury that his email communications with Oklah contained minimal detail because they "were talking about concerns or things that have to do with the Iraqi resistance against the Americans" and they did not want others involved to be caught.

On cross-examination, the defense sought to impeach Al-Dhari and to show that he had a pro-prosecution bias. Al-Dhari acknowledged that he was testifying about his and Oklah's shared involvement in "conspiracy crimes," but also testified that he believed that neither Oklah nor the Brigades committed any crime because "this is a right for anybody or any side to resist an invasion or occupation to their country." Al-Dhari testified that he received no promises or benefits from the U.S. government in exchange for his testimony, and he disputed that he had a "friendly" relationship with FBI Special Agent Stewart Whitson. Specifically, Al-Dhari denied receiving assistance obtaining a visa to travel to the United States, and he claimed that he alone bore the planning and financial burdens involved in that travel. Defense counsel also questioned Al-Dhari about his non-

governmental organization (NGO), which conducted lobbying activities. On re-direct examination, Al-Dhari admitted that he visited members of Congress after receiving an invitation from the Chair of the House Committee on Foreign Affairs.

Ali-Ways was the second witness who tied Oklah directly to the Brigades. Ali-Ways denied being a member of the Brigades himself, but he testified that he supported the Brigades and their goal of driving the Americans out of Iraq using IEDs. Ali-Ways testified that his father-in-law, Brigades member Abu Ghassan, was detained by U.S. forces after others turned him in for his involvement in the Brigades' activities. Ali-Ways testified that while Abu Ghassan was in prison, he saw Oklah, known to Ali-Ways as "Engineer Diya," in the family's village. Ali-Ways testified that Oklah asked him and other villagers about who would replace Abu Ghassan while he was in jail. The villagers informed Oklah that Abu Ghassan's brother, Hamdan Ibrahim Hamdan, would take Abu Ghassan's place in the Brigades. Several weeks later, Ali-Ways saw Oklah present Hamdan and others with a "gray-colored box." Ali-Ways testified that Oklah told him that the box could be used for explosions.

At trial, the jury saw Ali-Ways identify Oklah as "Engineer Diya" in a photograph shown to him during the course of his testimony. Then, after the Government showed Ali-Ways a second photo from his own laptop, Ali-Ways identified the individual in the laptop photo as his "friend," "Lieutenant Ahmed." Asked to compare the laptop photo to the photograph of "Engineer Diya" (i.e., Oklah), Ali-Ways said he could not tell for sure whether the photo on his laptop was of Oklah or of Lieutenant Ahmed because "they look like each other." Defense counsel argued in closing that Ali-

Ways' earlier testimony identifying Oklah was not credible because "[h]is testimony [wa]s, at best, confused."

Ali-Ways also testified about exchanging emails with Oklah. In these emails, Oklah sent "instruction[s] about electronic matters" and DTMF boards, and the two men discussed orders for components, such as transmitters and receivers, that Oklah sent to Iraq. Ali-Ways recounted Oklah's shipments of IED component parts for Abu Ghassan and recalled Oklah indicating that he was sending the DTMF boards and electronic components for the Brigades. The defense declined to cross-examine Ali-Ways.

The Government's physical evidence came from two U.S. military raids in Baghdad. In August 2006, military personnel, including James Dempsey, raided a third-floor facility at 50 Omar Street in Baghdad (Omar), where they discovered materials, tools, and components (including DTMF circuit boards) that were consistent with remote-controlled IED manufacturing on site. Investigators found Oklah's fingerprints on many of these items, including a device that one expert witness described as a completed IED switch, a document describing how to use a cell phone to detonate an explosive device, and a Scanlock 2000 bug detector that can be used to test IED controllers. Investigators also found identification documents at Omar bearing Oklah's photo and fingerprints.

A second raid took place in December 2007 at a house in the Amiriya neighborhood of Baghdad (Amiriya). There, American military personnel found explosives, boxes, radios, triggers, circuits, and tools hidden behind a wall. Investigators identified Oklah's fingerprint inside a box at the Amiriya site, and the box contained a DTMF circuit board. Trial witnesses described that American

soldiers delivered the evidence garnered from both raids to the Combined Explosive Exploitation Cell (CEXC), a Department of Defense (DoD) laboratory located at the U.S. military base in Baghdad, where investigators classified, examined, and analyzed the evidence. Ultimately, investigators sent the evidence to the Terrorist Explosive Device Analytical Center (TEDAC) in the United States, where FBI engineers further analyzed the evidence and generated many "TEDAC reports" outlining their findings. The Government's explosives expert, Christopher Graham, testified over several days of the trial. He explained the evidence found at the Omar and Amiriya sites and testified that, in his opinion, Omar was an "IED switch factory" and that certain characteristics of the electronic components found at the site indicated that they were intended to be used for IEDs.

## B.  Oklah's Defense

The defense argued at trial that Oklah ran a legitimate electronics business in Iraq before he moved to China and that he continued his business from there. The defense narrative was that Oklah is a Syrian national, not an Iraqi; that he had no anti-American motivation; and that he did not stand to benefit from the Brigades' goal of driving the Americans out of Iraq. The defense emphasized the Government's high burden of proof and worked to cast doubt on the Government's evidence.

First, the defense attacked Al-Dhari's credibility, arguing that he was motivated to testify on the Government's behalf to curry favor and obtain benefits. The defense argued that Al-Dhari's testimony was unreliable because it was based on Harith's second-hand statements and because Al-Dhari lacked personal knowledge of Oklah's activities. The

defense called Joel Rubin, an agent for Al-Dhari's NGO and advocacy group, the Iraqi National Project, to testify. Rubin had arranged for Al-Dhari to meet personally with members of Congress "that have the most thorough jurisdiction over Iraq policy," and he testified that Al-Dhari traveled to Washington, D.C., in the months leading up to trial to lobby lawmakers concerning the peace and reconciliation movement in Iraq.

To impeach Al-Dhari's testimony, Oklah also called FBI Special Agent Whitson, the Government's primary point of contact with Al-Dhari in the pretrial period. Defense counsel questioned Whitson about the ingratiating tone of emails he exchanged with Al-Dhari, in which Whitson offered to help Al-Dhari obtain a Latvian visa,[3] called Al-Dhari a "friend," and provided his telephone number for Al-Dhari to give to a border official if he had any problems at the border. The defense also examined Whitson about whether he attempted to have Al-Dhari removed from the "no-fly list" or otherwise helped facilitate Al-Dhari's travel to the United States.

Oklah argued to the jury that the Government was wrong about the Brigades' goals and that, because portions of the Brigades were working *with* American forces, the Government could not prove that Oklah targeted Americans merely by connecting him to the Brigades. Among other witnesses, Oklah called retired U.S. Marine Corps Colonel Joseph L'Etoile, who worked with the Pentagon's Close Combat Lethality Task Force and had previously been deployed to Iraq. L'Etoile testified that he had six meetings with individuals who were "representing themselves" as Brigades leaders and that, after the meetings, attacks on U.S.

---

[3] The FBI conducted its initial interview of Al-Dhari in Latvia.

soldiers declined and purported Brigades members participated in military operations against Al-Qaeda.[4]

Oklah sought to characterize the Government's investigation as sloppy and its evidence as innocuous. The defense called expert Donald Hansen to testify that the military's collection of evidence was "haphazard" and that there was insufficient record of its chain of custody to show that the Government's evidence actually came from Omar. Finally, the defense called several witnesses to testify that the electronics components found at Omar are sold at markets in Baghdad and that the DTMF circuit boards seized from Omar were commercially manufactured or otherwise not suitable for IED use.

### C. Jury Deliberations and Verdict

The jury deliberated for almost two days and asked the court nine questions during its deliberations. On March 16, the jury convicted Oklah on Counts One, Two, Three, and Four, and acquitted him on Counts Five and Six. On November 7, 2018, the district court sentenced Oklah to life imprisonment on Counts One and Four, to run concurrently; 240 months on Count Two, to run concurrently with the sentences on Counts One and Four; and 360 months on Count Three, to run consecutively to the life sentences. Oklah timely appealed.

### Discussion

### I.  Extraterritoriality

Count Two charged Oklah with conspiracy to maliciously damage or destroy U.S. government property by

---

[4] On cross-examination, L'Etoile testified that these individuals supporting the coalition were not permitted to use IEDs.

means of an explosive, in violation of 18 U.S.C. § 844(f) and (n). In the district court, Oklah moved pretrial to dismiss Count Two, arguing that § 844(f) and (n) cannot apply to the extraterritorial conduct charged in the indictment. The district court denied the motion, and Oklah argues on appeal that the district court erred.

### A. The Presumption Against Extraterritoriality

We review de novo whether a statute applies extraterritorially, *United States v. Hussain*, 972 F.3d 1138, 1142 (9th Cir. 2020), and apply a two-step test, *see RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016). At Step One, we presume that a statute applies only domestically and ask "whether 'Congress has affirmatively and unmistakably instructed that' the provision at issue should 'apply to foreign conduct.'" *Abitron Austria GmbH v. Hetronic Int'l., Inc.*, No. 21-1043, 2023 WL 4239255, at *4 (U.S. June 29, 2023) (quoting *RJR Nabisco*, 579 U.S. at 335, 337). If that indication is present, the statute applies abroad and the extraterritoriality analysis ends. *See id.*; *RJR Nabisco*, 579 U.S. at 337. If an affirmative indication is absent, the statute applies only domestically and we proceed to Step Two, where we ask whether "the conduct relevant to the statute's focus occurred in the United States." *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1936 (2021) (quoting *RJR Nabisco*, 579 U.S. at 337). If the relevant conduct occurred in the United States, "the case involves a permissible domestic application even if other conduct occurred abroad." *Id.* (quoting *RJR Nabisco*, 579 U.S. at 337).

The presumption against extraterritoriality is a "canon of construction," not "a limit upon Congress's power to legislate." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010). The Supreme Court has cautioned that we must

not ask "whether we think Congress would have wanted a statute to apply to foreign conduct if it had thought of the situation before the court," but should instead ask "whether the statute gives a clear, affirmative indication" that rebuts the presumption against extraterritoriality. *RJR Nabisco*, 579 U.S. at 335, 337.

*Morrison*, *RJR Nabisco*, *Nestlé*, and *Abitron* were civil cases. The Supreme Court has yet to apply the two-step framework to a criminal case. The Government reads our decisions in *United States v. Felix-Gutierrez*, 940 F.2d 1200 (9th Cir. 1991); *United States v. Vasquez-Velasco*, 15 F.3d 833 (9th Cir. 1994); and *United States v. Corey*, 232 F.3d 1166 (9th Cir. 2000), as establishing that the "territorial presumption does not govern the interpretation of criminal statutes that, by their nature, implicate the legitimate interests of the United States abroad." The Government also takes this argument one step further, citing the Seventh Circuit's decision in *United States v. Leija-Sanchez*, 820 F.3d 899 (7th Cir. 2016), to suggest that *RJR Nabisco*'s two-step framework does not apply to any criminal statute. We agree that some of our older case law could be read to suggest that the presumption against extraterritoriality does not apply to criminal statutes. But the Supreme Court has more recently suggested that the presumption applies "in all cases" without qualification. *Morrison*, 561 U.S. at 261. And in dicta, the Court has implied that the presumption applies to criminal statutes. *See Bond v. United States*, 572 U.S. 844, 857 (2014).

After *RJR Nabisco*, we have applied its two-step framework to the criminal statutes at issue in *Hussain*, 972 F.3d at 1142–43 (using the *RJR Nabisco* framework to determine whether wire fraud crimes had a domestic focus); *United States v. Perez*, 962 F.3d 420, 439–41, 439 n.5 (9th

Cir. 2020) (interpreting the Violent Crimes in Aid of Racketeering statute under the *RJR Nabisco* framework); and *United States v. Ubaldo*, 859 F.3d 690, 700 (9th Cir. 2017) (applying *RJR Nabisco*'s two-step test to statutes criminalizing weapons smuggling).    This precedent forecloses the Government's suggestion that the presumption does not apply to criminal statutes.

A "clear, affirmative indication" of extraterritorial application does not require an "express statement of extraterritoriality."  *RJR Nabisco*, 579 U.S. at 339–40; *see Morrison*, 561 U.S. at 256 ("[W]e do not say . . . that the presumption against extraterritoriality is a 'clear statement rule.'" (citation omitted)).    The indication may be demonstrated by context. *RJR Nabisco*, 579 U.S. at 340.  For example, the arms-smuggling statutes at issue in *Ubaldo* contained no explicit statement that they applied abroad, *see* 18 U.S.C. § 992(l); 22 U.S.C. § 2778(b)(2), but we considered the nature of the criminalized conduct— "illegally importing weapons into the United States"— and legislative history establishing congressional intent "to capture conduct occurring outside the United States." *Ubaldo*, 859 F.3d at 700–01.  *Ubaldo* quoted two House Reports declaring that the weapons-smuggling statutes involved in that case "shall be administered in a manner which will carry out [a] policy" to "exert leadership in the world community to bring about arrangements for reducing the international trade in implements of war" and "to strengthen Federal controls over interstate and foreign commerce in firearms." *Id.* at 701 (first quoting H.R. Rep. No. 94-1144, at 23 (1976), and then quoting H.R. Rep. No. 90-1577, at 6 (1968)).  *Ubaldo* reasoned, "The fact that illegally importing weapons into the United States almost always requires some conduct in a foreign country

distinguishes it from most other crimes" and concluded the presumption against extraterritoriality had been rebutted by the statute's text and legislative history. *Id.* at 700–01.

Part of the context we consider in Oklah's case is the Supreme Court's opinion in *United States v. Bowman*, a decision that has informed our jurisprudence in this area for over a century. 260 U.S. 94 (1922). In *Bowman*, three American citizens and one British national entered into a conspiracy while aboard the steamship *Dio* as it approached a port in Brazil. *Id.* at 95. The U.S. government owned the steamship, but it was operated by the National Shipping Corporation on behalf of the Emergency Fleet Corporation, an entity also wholly owned by the United States. *Id.* The defendants were charged with conspiring to defraud the Emergency Fleet Corporation by presenting an invoice for 1,000 tons of fuel oil, but onboarding only 600 tons and pocketing the payment for the undelivered 400 tons. *Id.* at 95–96. The statute under which they were charged criminalized making, and conspiring to make, a false or fraudulent claim against "any corporation in which the United States of America is a stockholder." *Id.* at 100 n.1 (quoting Act of October 23, 1918, Pub. L. No. 65-228, 40 Stat. 1015, 1015 (1918) (codified as amended at 18 U.S.C. § 287)). The *Bowman* defendants argued that the statute did not apply to their extraterritorial conduct because it was silent as to its extraterritorial effect and because neither party disputed that the charged conduct occurred on the high seas. *Id.* at 96–97.

*Bowman* explained that whether a statute is given extraterritorial application is a "question of statutory construction":

> The necessary locus, when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations. *Crimes against private individuals or their property . . . must, of course, be committed within the territorial jurisdiction* of the government where it may properly exercise it. *If punishment of them is to be extended* to include those committed outside of the strict territorial jurisdiction, *it is natural for Congress to say so* in the statute, and failure to do so will negative the purpose of Congress in this regard. . . .
>
> *But the same rule of interpretation should not be applied to criminal statutes [that] . . . are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated*, especially if committed by its own citizens, officers, or agents. Some such offenses . . . are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. *In such*

*cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.*

*Id.* at 97–98 (emphases added).[5]

The *Bowman* Court provided a list of examples of statutes that, by their nature, would be "greatly . . . curtail[ed]" in "scope and usefulness" and "leave open a large immunity" if they could not be applied abroad. *Id*. Notably, the examples provided in *Bowman* are statutes that criminalize conduct that implicates the right of the government to defend itself against obstruction and that is likely to occur overseas: (1) "knowingly certify[ing] a false invoice [while acting as a U.S. consul]"; (2) "[f]orging or altering ship's papers"; (3) "enticing desertions from the naval service"; (4) "bribing a United States officer of the civil, military or naval service"; (5) "defraud[ing] . . . the United States or any captor or claimant [of prize property]"; and (6) "steal[ing] . . . property of the United States . . . to be used for military or naval service." *Id.* at 99–100. The Court noted that all six examples appeared in a chapter of the Criminal Code entitled "Offenses against the Operation of the Government." *Id.* at 98–99.

---

[5] Because the British defendant in *Bowman* was never apprehended, the *Bowman* Court was not required to, and declined to, decide whether charging a foreign national for offenses committed abroad was consistent with the "law of nations." *Bowman*, 260 U.S. at 96, 98, 102–03. As we explain below, international law now answers that question in the affirmative. *See Vasquez-Velasco*, 15 F.3d at 841; *Felix-Gutierrez*, 940 F.2d at 1205–06.

For decades, our court has read *Bowman* to say that whether a statute has extraterritorial reach depends on the nature of the criminalized conduct and the interests that the statute protects. *See, e.g.*, *Vasquez-Velasco*, 15 F.3d at 839 ("Where '[t]he locus of the conduct is not relevant to the end sought by the enactment' of the statute, and the statute prohibits conduct that obstructs the functioning of the United States government, it is reasonable to infer congressional intent to reach crimes committed abroad." (alteration in original) (emphasis omitted) (quoting *United States v. Cotten*, 471 F.2d 744, 751 (9th Cir. 1973))). More specifically, *Bowman* suggests that offenses against private parties or their property primarily "affect the peace and good order of the community" and must be committed within the territorial jurisdiction of the United States. *Bowman*, 260 U.S. at 98. For this type of statute, Congress must expressly state that it applies overseas. *Bowman* teaches that the same is not true for crimes that are not "logically dependent" on their locality, and are instead "enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents." *Id.*

*Brulay v. United States*, 383 F.2d 345 (9th Cir. 1967), illustrates our court's interpretation of *Bowman*'s rule. There, we applied *Bowman* to conclude that a drug-smuggling statute applied outside the United States because "smuggling by its very nature involves foreign countries, and . . . always requires some action in a foreign country." *Id.* at 350 (citing *Bowman*, 260 U.S. at 98). *Ubaldo* quoted this passage when it held, after the two-step rule from *RJR Nabisco* had been announced, that weapons-smuggling statutes apply extraterritorially. *See Ubaldo*, 859 F.3d at 700–01 (quoting *Brulay*, 383 F.2d at 350). *Stegeman v.*

*United States*, 425 F.2d 984 (9th Cir. 1970) (en banc), provides another example. There, we reasoned that a statute prohibiting concealment of assets from a bankruptcy trustee applies extraterritorially because to conclude otherwise would "frustrate the statute's purpose by creating an obvious and readily available means of evasion." *Id.* at 986. In *United States v. Walczak*, we applied *Bowman* to conclude that 18 U.S.C. § 1001, which criminalizes false statements to federal government officials, applied to false statements made on a customs declaration completed abroad. 783 F.2d 854 (9th Cir. 1986) (per curiam). Finally, our decision in *Felix-Gutierrez* concluded, based on *Bowman*, that statutes prohibiting kidnapping and murder of federal officers and employees apply to extraterritorial conduct. 940 F.2d at 1204.[6]

We have not articulated a generally applicable rule that emerges from these cases, but we find that the D.C. District Court's decision in *United States v. Al-Imam*, 373 F. Supp. 3d 247 (D.D.C. 2019) aptly describes how *Bowman* may be reconciled with *Morrison* and *RJR Nabisco*:

> *Bowman* is satisfied when (1) a federal criminal offense directly harms the U.S. Government, and (2) enough foreseeable overseas applications existed at the time of a

---

[6] The Government also cites *United States v. Kazzaz*, 592 F. App'x 553 (9th Cir. 2014), an unpublished decision that post-dates *Morrison*. In *Kazzaz*, we held that 18 U.S.C. § 371 (which prohibits conspiracy to defraud the United States) and the Anti-Kickback Act apply abroad because those statutes "by their nature implicate the legitimate interests of the United States." 592 F. App'x at 555 (quoting *Corey*, 232 F.3d at 1170) (citing *Bowman*, 260 U.S. at 98; *Felix-Gutierrez*, 940 F.2d at 1204; and *Cotten*, 471 F.2d at 750).

> statute's enactment (or most recent amendment) to warrant the inference that Congress both contemplated and authorized prosecutions for extraterritorial acts.

373 F. Supp. 3d at 261 (citing *United States v. Delgado-Garcia*, 374 F.3d 1337, 1347 (D.C. Cir. 2004)).  We adopt *Al-Imam*'s formulation of *Bowman*'s rule because it accurately and persuasively summarizes the same legal principle that emerges from our own cases.

Oklah urges us to take a different approach.  Setting aside decades of circuit precedent in which we have applied *Bowman* and have given extraterritorial effect to statutes that criminalize conduct that harms the federal government, Oklah argues that *Bowman*'s analysis is "outmoded and incompatible" with *Morrison* and *RJR Nabisco*.  He urges us to follow the D.C. Circuit's decision in *United States v. Garcia Sota*, which rejected "a broad rule that criminal statutes that protect the United States Government from harm" should apply beyond our borders.  948 F.3d 356, 360 (D.C. Cir. 2020).

*Garcia Sota* held that 18 U.S.C. § 1114, a statute that criminalizes the murder of federal officers and employees, did not apply extraterritorially.  948 F.3d at 357.  In reaching that conclusion, the D.C. Circuit strictly applied the rule from *RJR Nabisco* and held that § 1114 did not apply abroad because it lacked an explicit Step-One statement indicating congressional intent for § 1114 to have extraterritorial reach, and the D.C. Circuit did not see any other clear indication that the presumption was overcome.  *Id.* at 358–60.  We have taken a different approach and have long held that § 1114 applies abroad.  *See United States v. Lopez-Alvarez*, 970

F.2d 583, 596 (9th Cir. 1992).  As we explained in *Felix-Gutierrez*:

> [W]e will infer congressional intent to provide for extraterritorial jurisdiction for crimes that are not dependent on the locality in which they were committed "but are enacted because of the right of the Government to defend itself . . . ."

940 F.2d at 1204 (quoting *Bowman*, 260 U.S. at 98); *accord Vasquez-Velasco*, 15 F.3d at 839 n.4.  *Garcia Sota* does not persuade us to change course.  If anything, the statute Congress enacted in response to *Garcia Sota* suggests that Congress is mindful of *Bowman*'s longstanding rule.[7]

We are not persuaded that *Bowman* cannot be reconciled with the Supreme Court's more recent decisions in *Morrison* and *RJR Nabisco*.  We recognize that *Bowman* is not a perfect fit for this case—Oklah is a foreign national, the charged conduct occurred entirely in a foreign country, and the conduct criminalized by 18 U.S.C. § 844(f) does not always occur abroad.  Nevertheless, *Bowman* has been settled law for over a century.  We are mindful of the Supreme Court's instruction that "'[i]f a precedent of [the Supreme] Court has direct application in a case,' . . . a lower

---

[7] The year after *Garcia Sota* issued, Congress responded by passing a law to "clarify the original intent" that § 1114 and two similar statutes applied extraterritorially.  Jamie Zapata and Victor Avila Federal Officers and Employees Protection Act, § 2(5), Pub. L. No. 117-59, 135 Stat. 1468, 1468 (2021).  Congress amended all three statutes to make them explicitly extraterritorial.  *Id.* § 3 (codified at 18 U.S.C. §§ 111, 115, 1114).  In doing so, Congress specifically approved of the approach taken by the Second, Ninth, and Eleventh Circuits in holding that § 1114 applies extraterritorially.  *Id.* § 2(3).

court 'should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions'"—"even if the lower court thinks the precedent is in tension with 'some other line of decisions.'"[8] Our consistent application of *Bowman*'s rule is part of the context we consider in deciding whether Congress intended § 844(f) to apply abroad. *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019) ("Congress legislates against the backdrop of existing law." (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013))).

B. 18 U.S.C. § 844(f): Damage or Destruction of Federal Property by Means of Fire or Explosive

With *Al-Imam*'s legal framework and our longstanding interpretation of *Bowman* in mind, we ask whether the text and context of 18 U.S.C. § 844(f) and (n) provide a clear indication that they apply extraterritorially. We begin with the statute's text. Subsection (f) criminalizes "damag[ing] or destroy[ing], by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof, or any institution or organization receiving Federal financial assistance." 18 U.S.C. § 844(f)(1). Because Subsection (n) criminalizes conspiracy to commit any of the offenses listed in 18 U.S.C. § 844, whether it applies extraterritorially

---

[8] *Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028, 2038 (2023) (quoting *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989)); *see Nunez-Reyes v. Holder*, 646 F.3d 684, 692 (9th Cir. 2011) (en banc) ("As a circuit court, even if recent Supreme Court jurisprudence has perhaps called into question the continuing viability of its precedent, we are bound to follow a controlling Supreme Court precedent until it is explicitly overruled by that Court." (internal quotations, alterations, and citations omitted)).

depends on whether § 844(f) applies extraterritorially. *See Felix-Gutierrez*, 940 F.2d at 1205 ("We have inferred extraterritorial application of conspiracy statutes on the basis of a finding that the underlying substantive statutes reach extraterritorial offenses."); *Perez*, 962 F.3d at 440–41.

Neither subsection's text contains an explicit statement of extraterritorial reach, but this does not end our inquiry. *See RJR Nabisco*, 579 U.S. at 340 ("[A]n express statement of extraterritoriality is not essential."). Following *RJR Nabisco*, we next look to the statute's context. Like the conduct criminalized by the statute considered in *Bowman* and the examples the Court listed in that decision, conduct that damages or destroys federal property unquestionably tends to obstruct the federal government's functions regardless of where it occurs, and therefore implicates the right of the government to defend itself. *Bowman*, 260 U.S. at 98. There were enough foreseeable overseas applications at the time § 844(f) was enacted to warrant the inference that Congress contemplated and authorized extraterritorial application because the federal government owns a significant amount of property outside the United States' territorial jurisdiction.[9] We also consider that, if we were to

---

[9] Section 844(f) was enacted as part of the Explosive Control Act, which constitutes Title XI of the Organized Crime Control Act of 1970. *See* Pub. L. No. 91-452, § 1102(a), 84 Stat. 922, 957. Its most recent substantive amendment occurred as part of the Homeland Security Act of 2002. *See* Pub. L. No. 107-296, §§ 1125, 1127, 116 Stat. 2135, 2285–86 (amending § 844(f) to include "any institution or organization receiving Federal financial assistance" within its ambit). In 2002, the State Department alone was responsible for about 3,500 U.S. Government-owned properties at over 220 overseas locations. U.S. Gov't Accountability Off., GAO-02-590, *State Department: Sale of Unneeded Overseas Property Has Increased, but Further Improvements* (cont.)

conclude that § 844(f) is limited to the United States' territorial jurisdiction, it would "greatly . . . curtail [its] scope and usefulness" and "leave open a large immunity" for acts causing damage or destruction of federal property that are "as easily committed . . . on the high seas and in foreign countries as at home." *Id*.

The conclusion that § 844(f)'s prohibition on damage or destruction of federal property applies abroad as well as domestically also conforms to the most analogous pre-*Morrison* precedent from our circuit, *Cotten*. In *Cotten*, we considered 18 U.S.C. § 641. 471 F.2d at 749–51. That statute prohibits theft of U.S. government property. *Cotten* reasoned that, because § 641 "certainly represents an exercise by the Government of its right to defend itself," limiting its application abroad would "allow and condone lawlessness at Government installations wherever located." *Id.* at 750. Under *Al-Imam*'s framework, we discern no reason why we should analyze the extraterritoriality of a statute that prohibits damage or destruction of government property differently from one that criminalizes theft of the same.

We acknowledge that § 844(f) sweeps in the property of "any institution or organization receiving Federal financial assistance." Much of that property, like federal property, is located abroad. We have not addressed the extent to which damage or destruction of this type of property implicates the government's right to defend itself against obstruction. *Cf. United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1126, 1130 (N.D. Cal. 2015) (concluding that *Bowman* supplied no basis to apply wire fraud and corruption statutes to

---

*Are Necessary* 1 (2002), https://www.gao.gov/assets/gao-02-590.pdf [https://perma.cc/ZAT6-6YUJ].

defendants' extraterritorial bribery of an employee of a United Nations agency funded in part by the U.S. government).  Oklah does not argue that the "institution or organization" clause in § 844(f) changes the extraterritoriality analysis in his case, which rests only on the government-property clause, but we briefly consider whether it alters § 844(f)'s otherwise extraterritorial scope.

The "institution or organization" clause is a relatively recent addition to the statute.  It was first proposed as Section 5 of the Anti-Terrorism Explosives Act of 2002.  *See* Anti-Terrorism Explosives Act of 2002 § 5, H.R. 4864, 107th Cong.  That bill became the Safe Explosives Act, which Congress ultimately enacted as Title IX, Subtitle C of the Homeland Security Act of 2002.  *See* Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 1121, 1125, 116 Stat. 2135, 2280, 2285.  The House Report on the Anti-Terrorism Explosives Act explained the purpose of the § 844(f) amendment as, among other things, "expand[ing] Federal jurisdiction over intentional fires or explosions occurring on Federal property to include institutions or organizations receiving Federal financial assistance" and "provid[ing] the protection of Federal criminal laws to additional entities." H.R. Rep. No. 107-658, at 5–6, 14; *see* 148 Cong. Rec. S11374, S11393, 2002 WL 31567345 (ordering by unanimous consent that this report's section-by-section analysis be printed in the Congressional Record of the Senate debate on the Homeland Security Act).  This legislative history does not suggest that Congress intended the 2002 amendment to restrict § 844(f)'s extraterritorial reach, and we see no other indication that Congress intended this later-adopted amendment to limit the extent to which § 844(f)'s government-property clause applies overseas.

C.  Location of Apprehension, Nationality, and the Rule
    of Lenity

Oklah contends that *Bowman* is not controlling because:
(1) he was apprehended abroad; (2) he is a foreign national;
and (3) to the extent § 844(f)'s application to him is
ambiguous, the rule of lenity tips the balance in his favor.
As to the first argument, we are unaware of any precedent or
legal principle that renders the location of a defendant's
apprehension (as distinct from the location of the alleged
criminal conduct) relevant to whether a criminal statute
applies abroad, and Oklah has not presented any support for
this argument apart from asserting it in conclusory terms.
*See* Fed. R. App. P. 28(a)(8)(A) (The appellant's brief must
set forth both "appellant's contentions and the reasons for
them, with citations to the authorities . . . on which the
appellant relies."). We are not persuaded that the location of
Oklah's apprehension bears on whether § 844(f) applies to
his conduct.

Oklah's second argument is based on his foreign
nationality, and it has greater merit. In *Bowman*, the
Supreme Court stated that its rule applies "especially" if the
charged crime is committed by U.S. "citizens, officers, or
agents." *Bowman*, 260 U.S. at 98. The only defendant in
*Bowman* who was a foreign national was still at large, and
the Supreme Court expressly reserved the question of "what,
if any, jurisdiction the District Court below has to punish
him when he is brought to trial." *Id.* at 102–03. From this,
Oklah urges us to conclude that *Bowman*'s rule does not
allow the Government to prosecute him.

Oklah's nationality is relevant to the question of
statutory construction with which we grapple at Step One of
the *RJR Nabisco* analysis, but only indirectly. His

nationality-based argument sounds in the international law of jurisdiction.[10]  *See id.*  When a statute does not expressly provide for extraterritorial application, we may consult international law as part of the relevant context that we consider at Step One.  *See United States v. Neil*, 312 F.3d 419, 422 (9th Cir. 2002); *see also Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains . . . .").

We have applied statutes that otherwise provide a clear indication of extraterritorial effect to nationals and foreigners alike, but only after confirming that doing so is consistent with international law.  *See, e.g.*, *Neil*, 312 F.3d at 422; *Felix-Gutierrez*, 940 F.2d at 1205.  Our circuit has recognized five theories of international criminal jurisdiction: "territorial, national, protective, universality, and passive personality."  *United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002); *see* Restatement (Fourth) of Foreign Relations Law § 402(1) & cmts. e–k (Am. L. Inst. 2018).

Jurisdiction under the passive personality principle is based on the nationality of the victim, regardless of the accused's nationality.  *Neil*, 312 F.3d at 422–23.  Count Two of the operative indictment charged Oklah with violating subsections (f) and (n) of § 844 by conspiring to damage or destroy property owned by the Department of Defense.  The Department of Defense is a component of the U.S. government.  Under the protective principle, "jurisdiction is based on whether the national interest or national security is

---

[10] Oklah does not argue that the statute or his conviction is inconsistent with international law.

threatened or injured by the conduct in question." *Felix-Gutierrez*, 940 F.2d at 1206. Count Two charged Oklah with conduct that plainly threatens the national interest. Thus, two different principles of international law support the assertion of jurisdiction for purposes of Count Two, and we are unconvinced that Oklah's nationality counsels against extraterritorial application of § 844(f) in this case.[11]

Finally, we reject Oklah's argument that the rule of lenity should apply. After consulting the relevant context, including *Bowman*, we conclude that the exterritorial reach of § 844(f) is not ambiguous. *See Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) ("Th[e] rule [of lenity] applies only when a criminal statute contains a grievous ambiguity or uncertainty, and only if, after seizing everything from which aid can be derived, the Court can make no more than a guess as to what Congress intended." (citation and internal quotation marks omitted)); *see also Bowman*, 260 U.S. at 102 (rejecting the defendants' lenity argument).

Having considered § 844(f)'s unqualified text and context, we conclude that this statute is one of the "rare statute[s] that clearly evidences extraterritorial effect despite lacking an express statement of extraterritoriality." *RJR Nabisco*, 579 U.S. at 340; *see also Al-Imam*, 373 F. Supp. 3d at 265–66 (holding that § 844(f) applies abroad). Because

---

[11] Under the national principle (also called the "active personality" principle), a nation can "apply its statutes to extraterritorial acts of its own nationals." *Hill*, 279 F.3d at 740. The apprehended defendants in *Bowman*, and both defendants in *Cotten*, were U.S. nationals, so asserting jurisdiction over them was proper under the national principle. *See Bowman*, 260 U.S. at 95, 102; *Cotten*, 471 F.2d at 745, 749–51. Here, because Oklah is not a U.S. national, the national principle would not permit the district court to assert jurisdiction over the charged extraterritorial conduct.

we conclude that the presumption against extraterritoriality is rebutted by the context of § 844(f) at *RJR Nabisco* Step One, we need not and do not proceed to Step Two of the *RJR Nabisco* analysis.  *See Hussain*, 972 F.3d at 1143.

## II. Use of Classified Information

The Government's investigation of Oklah's case included classified materials.   Thus, during pretrial discovery, the Government and Oklah invoked the processes set forth in the Classified Information Procedures Act (CIPA), 18 U.S.C. app. 3.

The Government ultimately filed four ex parte motions invoking CIPA procedures to withhold or "substitute" classified information from discovery.  *See* 18 U.S.C. app. 3 §§ 4, 6.   We discuss these motions only generally and without any reference to the content of the classified information.   With one exception explained below, the district court granted the Government's motions to provide "substitutions" to the defense in place of some of the classified information.   The court also allowed the Government to withhold ("delete") some of the classified information from its discovery responses.

On January 19, the week before trial began, the Government filed its third CIPA motion and sought permission to withhold certain classified information.  The district court rejected this request and ultimately approved a one-page substitution that was disclosed to the defense (the Al-Dhari substitution).  The Government acknowledged this substitution was produced late, and it agreed to stipulate to the Al-Dhari substitution's admissibility at trial.  The Al-Dhari substitution played a significant role in the trial court proceedings and was the basis for additional motions

practice before the district court.**[12]**   Oklah argued, among other things, that the substitution showed Al-Dhari testified falsely about his role in the Brigades at his pretrial deposition and that the Government should be required to search DoD's records broadly for further evidence of cooperation between the Brigades and U.S. military forces.

On appeal, Oklah preserves his contention that the Government's use of CIPA procedures, including the use of CIPA substitutions, violated his Fifth and Sixth Amendment rights.  He also requests that our court independently review the classified evidence the Government withheld from him, and that we obtain independent translations of any original submissions or source material written in Arabic.**[13]**   We review for abuse of discretion the district court's CIPA discovery orders.  *See United States v. Clegg*, 740 F.2d 16, 18 (9th Cir. 1984).

"Congress enacted CIPA in 1980 'to help ensure that the intelligence agencies are subject to the rule of law and to help strengthen the enforcement of laws designed to protect both national security and civil liberties.'"   *United States v.*

---

[12] In the Al-Dhari substitution, the Government acknowledged that Al-Dhari was a commander in the Brigades; that he was part of an insurgent group operating in Iraq; and, that the Brigades were fighting multinational forces in Iraq.

[13] Oklah generally disputed the accuracy of the Arabic translations introduced by the Government at trial.  But as the district court recognized, Oklah never lodged specific objections to the Government's translations and did not call his own Arabic expert to testify.  In his brief on appeal, Oklah cites one example of a translation that he argues indicates that the FBI's translations were unreliable.  This example shows only that during cross-examination, the translator changed his English interpretation of Arabic text after he was shown a better-quality image of an exhibit.

*Sedaghaty*, 728 F.3d 885, 903 (9th Cir. 2013) (quoting S. Rep. No. 96-823, at 3 (1980)).  CIPA "does not expand or restrict established principles of discovery and does not have a substantive impact on the admissibility of probative evidence."  *Id*.  Instead, CIPA provides a procedural mechanism for handling classified information in criminal cases so that district courts may rule on admissibility issues involving classified information before introduction of such materials in open court. *Id.* at 903–04.[14]  Two CIPA sections are relevant here: Section 4, which governs pretrial discovery of classified information by defendants; and Section 6, which governs the procedures for safeguarding classified information pretrial and during trial.

"Congress intended [S]ection 4 to clarify the court's powers under Fed. R. Crim. P. 16(d)(1) to deny or restrict discovery in order to protect national security." *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988). Section 4 provides that a district court may authorize the Government, "upon a sufficient showing," to take any of three actions: (1) "to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure"; (2) "to substitute a summary of the information for such classified documents"; or (3) "to substitute a statement admitting relevant facts that the classified information would tend to prove."  18 U.S.C. app. 3, § 4.

---

[14] *See United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988) (explaining that Congress passed CIPA to prevent the problem of "graymail," a practice by which "defendants pressed for the release of classified information to force the government to drop the prosecution").

District courts may review the Government's CIPA motions in camera and ex parte.  *See, e.g.*, 18 U.S.C. app. 3, § 4 ("The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone."); Fed. R. Crim. P. 16(d)(1); *Sedaghaty*, 728 F.3d at 908 ("CIPA does not limit the court's discretion to hold an ex parte conference if it is required by some overriding necessity such as the necessity to protect sensitive information related to national security.").  Oklah recognizes that our precedent forecloses the argument that his constitutional rights were violated because he and his counsel were not present at several CIPA hearings, and because his counsel was prohibited from sharing or discussing certain "Secret"-level documents with him, *see, e.g.*, *Sedaghaty*, 728 F.3d at 908, 910, but he questions whether the Government complied with CIPA in other respects.

A district court considering a request by the Government to withhold classified information first must determine whether the Federal Rules of Criminal Procedure, a statute, or common law make the information discoverable to the defense (as, for example, evidence "material to preparing the defense" pursuant to Rule 16(a)(1)(E)(i)).  *Sedaghaty*, 728 F.3d at 904; *see United States v. Rewald*, 889 F.2d 836, 847 & n.5 (9th Cir. 1989), *amended*, 902 F.2d 18 (9th Cir. 1990).  If the material is discoverable, the Government must formally assert the state-secrets privilege to withhold the information as classified.  *See United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1261 (9th Cir. 1998).  This claim of privilege must "be lodged by the head of the department which has actual control over the matter, after actual personal consideration by that officer."  *Id.* (quoting *United States v. Reynolds*, 345 U.S. 1, 7–8 (1953)).  If the court

determines that the information is discoverable and the state-secrets privilege applies, the court next must determine whether the evidence is "relevant and helpful" to the defense of the accused. *Sedaghaty*, 728 F.3d at 904 (quoting *Roviaro v. United States,* 353 U.S. 53, 60 (1957)). If the information is "relevant and helpful," CIPA Section 4 permits the district court to determine the terms of discovery. *Id.*

CIPA Section 6 governs "determinations concerning the use, relevance, or admissibility of classified information that would otherwise be made during the trial or pretrial proceeding." 18 U.S.C. app. 3, § 6(a). CIPA Section 6(c) deals with substitutions and provides that a court may authorize a substitution in place of classified material in the form of a statement or summary if the court "finds that the statement or summary will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." 18 U.S.C. app. 3, § 6(c)(1). A substitution need not be of "precise, concrete equivalence," and the "fact that insignificant tactical advantages could accrue to the defendant by the use of the specified classified information should not preclude the court from ordering alternative disclosure." *Sedaghaty*, 728 F.3d at 905 (quoting H.R. Rep. No. 96-1436, at 12–13 (1980) (Conf. Rep.)). The summary must be "evenhanded, worded in a neutral fashion and not tilted or shaded to the government's advantage." *Id.* at 906. We have held that a district court abuses its discretion by permitting a substitution that "excludes non-cumulative exculpatory information," "fails to provide crucial context," has "slanted wording," or is otherwise "incomplete." *Id.*

The Government filed four CIPA motions in Oklah's case. Oklah requests that we "review the classified record in full to determine whether he was denied material that would

have been relevant and helpful" and "whether the [Al-Dhari] Substitution protected his right to present a complete defense." The nature of our review is awkward—Oklah is forced to raise a CIPA claim "without actually knowing what the classified record contains, while we know what it contains but are unable to describe it on the public record." *Id.* Because we lack the benefit of the adversarial process, we are mindful that "we must place ourselves in the shoes of defense counsel, the very ones that cannot see the classified record, and act with a view to their interests." *United States v. Amawi*, 695 F.3d 457, 471 (6th Cir. 2012).

Having placed ourselves in defense counsels' shoes and examined the classified record in full, we conclude that the district court did not abuse its discretion in its CIPA rulings and confirm that the withheld classified materials were either not discoverable, or were not relevant and helpful to Oklah's defense. Nor did the district court abuse its discretion by authorizing the Government to turn over substitution statements to the defense in lieu of other discovery. The district court's CIPA rulings reflect that it thoroughly reviewed the classified documents to ensure that Oklah's defense would not be prejudiced, and we note that the court rejected one of the Government's requests to delete relevant and helpful information from discovery—a ruling with which we agree. We are satisfied that the CIPA substitutions provided Oklah "with substantially the same ability to make his defense as would disclosure of the specific classified information." 18 U.S.C. app. 3, § 6(c)(1).

However, in several of its supporting declarations, the Government failed to invoke the state-secrets privilege through "the *head of the department* which has actual control over the matter, after actual personal consideration by that officer." *Klimavicius-Viloria*, 144 F.3d at 1261 (emphasis

added) (quoting *Reynolds*, 345 U.S. at 7–8). Instead, the Government relied on supporting declarations from lower-ranked officials within the respective government entities. These declarations are insufficient to sustain the Government's invocation of the state-secrets privilege.

Our en banc court has explained that certification by a department's political head is "fundamental to the government's claim of privilege" and "responsibility for this task may not be delegated to lesser-ranked officials." *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1080 (9th Cir. 2010) (en banc). We recognize that CIPA itself does not impose this requirement but, as explained, CIPA does not expand or restrict established discovery principles, *Sedaghaty*, 728 F.3d at 903, and it presupposes the existence of the state-secrets privilege, *United States v. Aref*, 533 F.3d 72, 78 (2d Cir. 2008). Our prior CIPA decisions requiring a declaration from department heads sourced this obligation from the Supreme Court's decision in *United States v. Reynolds*, 345 U.S. 1, where the Court considered the scope of the state-secrets privilege. *See Sedaghaty*, 728 F.3d at 904; *Klimavicius-Viloria*, 144 F.3d at 1261. Accordingly, we adhere to the Supreme Court's and our own precedent applying the state-secrets privilege, and again hold that this privilege requires formal invocation by "the head of the department which has control over the matter" or by a "minister who is the political head of the department." *Reynolds*, 345 U.S. at 8 & n.20.

Other circuit courts are divided on this issue. *See, e.g.*, *Aref*, 533 F.3d at 80 (requiring privilege to be asserted by the head of the department as mandated by *Reynolds*); *United States v. El-Mezain*, 664 F.3d 467, 521–22 (5th Cir. 2011) (disagreeing with *Aref*); *United States v. Rosen*, 557 F.3d 192, 198 (4th Cir. 2009) (concluding that agency head did

not need to invoke privilege in criminal matters under CIPA).  As a three-judge panel, we must adhere to the rule set forth in our prior published CIPA decisions.**15**

Having concluded that the Government's invocations of the privilege are not backed by the required declarations of a department head, we address the proper remedy.  We excuse the Government's failure to comply with the formal invocation requirement in this case because, as the Second Circuit concluded in *United States v. Stewart*, "[i]t would 'be of little or no benefit' for us to remand for the purpose of having the department head agree that disclosure of the classified information would pose a risk to national security here."   590 F.3d 93, 132 (2d Cir. 2009) (alteration in original) (quoting *Aref,* 533 F.3d at 80).  Our review of the classified documents leaves no doubt that the Government may validly invoke the privilege in this case.

We note that the Government argued to the district court that it understood its classified declarations complied with our case law because courts applying *Sedaghaty* and *Klimavicius-Viloria* have purportedly accepted classified declarations from subordinate officials despite the rule announced in those cases.   This is insufficient.   The Government's invocation of the privilege must be backed by a declaration of a department head.  The Government is on notice—and has been at least since *Klimavicius-Viloria* was decided in 1998—that the procedures for invoking the state-secrets privilege require an actual declaration from the

---

[15] We are not persuaded that the requirements set forth by the Supreme Court in *Reynolds* should apply only in civil cases, *see Rosen*, 557 F.3d at 198; *El-Mezain*, 664 F.3d at 521, because a criminal defendant's right to a fair trial implicates compelling interests that are protected by our constitution.

political head of the department invoking the privilege. We expect that district courts in our circuit will enforce this rule strictly and that this issue will not arise in future CIPA cases.

### III. Jamal Al-Dhari's Deposition Testimony

Oklah argues that we must vacate his conviction because the use of Al-Dhari's deposition testimony at trial violated Oklah's rights under the Confrontation Clause; the Supreme Court's rulings in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959); and the rule against the admission of hearsay evidence. Oklah's challenges are closely related, but distinct. His confrontation challenge focuses on whether he had a sufficient opportunity to cross-examine Al-Dhari at his overseas deposition and whether the deposition could be introduced in lieu of Al-Dhari's live testimony at trial. Oklah's *Brady*/*Giglio* claims focus on whether the Government's delay in producing exculpatory and impeaching materials affected the trial's outcome. His *Napue* claim alleges that the Government violated his due process rights by introducing Al-Dhari's testimony, which Oklah contends was false or misleading. Finally, Oklah's hearsay challenge focuses on whether Al-Dhari impermissibly testified about Brigades leader Harith's unsworn, out-of-court statements. We affirm the district court's rulings as to each of these claims.

### A. Background Facts Related to Al-Dhari's Deposition

Jamal Al-Dhari was an important Government witness because he connected Oklah to the Brigades. He testified in this case via a pretrial deposition taken in Latvia that was played for the jury at trial.

On March 8, 2017, approximately ten months before trial, the parties filed a joint motion for leave to take three foreign depositions to use in lieu of live testimony at trial. The Government requested permission to depose Al-Dhari and Ali-Ways; Oklah sought to depose a person he identified as his employee in China, Guo Xu.[16]  The parties stipulated that their agreed-upon deposition procedure would protect Oklah's rights under the Confrontation Clause and sufficiently ensure the reliability of the witnesses' testimony.  They also represented there was a "chance [these witnesses] may not be able to travel to the United States to testify at trial," and stipulated that "the use of the [witnesses'] videotaped deposition testimony at trial subject to the Court's relevancy determination, is just under current circumstances."   The parties also stipulated that the videotaped testimony "be used in lieu of live testimony at trial."  The district court granted the parties' joint motion.

Meanwhile, on March 25, 2017, Al-Dhari traveled to the United States to meet with members of Congress.  He also met with Government counsel in Washington, D.C.  On June 14, 2017, the Government informed the defense that Al-Dhari had traveled to the United States and that the Government had interviewed him.   The Government produced email correspondence between Al-Dhari and FBI Special Agent Whitson.  In the emails, Whitson and Al-Dhari discussed Al-Dhari's pending visa application and the "Muslim travel ban" executive order issued in the United States in January 2017, which prevented Al-Dhari from traveling here.  Whitson told Al-Dhari that he would try to

---

[16] The parties cited Federal Rule of Criminal Procedure 15(h), which provides "the parties may by agreement take and use a deposition with the Court's consent."

provide updated information concerning Al-Dhari's pending visa application. The defense voiced no objection after receiving these disclosures, and defense counsel participated in Al-Dhari's deposition in Latvia on July 13. On September 28, trial was rescheduled to January 23, 2018.

In late November 2017, Oklah moved to strike Al-Dhari's foreign deposition. He argued that the Government had obtained his agreement to the foreign depositions by falsely representing that it was necessary to preserve Al-Dhari's testimony in a pretrial deposition, even though the Government knew that Al-Dhari was able to travel to the United States. The Government's opposition argued that both sides knew the foreign witnesses "were potentially able to travel to the United States," and that it had merely represented that Al-Dhari "*may not* be able to travel to the United States," not that he definitely would be unable to do so.

On January 16, 2018, the district court denied Oklah's motion to strike the depositions, but acknowledged that the Government's statements regarding its need to depose Al-Dhari overseas had been "arguably misleading." Accordingly, the court ordered the Government to "make every effort to secure" Al-Dhari's presence for trial because "[a]bsent evidence [Al-Dhari was] truly unavailable, [his] deposition[] w[ould] not be allowed at trial."

On January 17, the district court heard argument on Al-Dhari's unavailability. The Government represented that it had contacted Al-Dhari after receiving the court's order and had requested that he come to court in Phoenix. According to the Government, Al-Dhari responded by saying he did not understand "why his previous deposition was not sufficient, given [the court's] order" allowing overseas depositions to

be taken. Al-Dhari "decline[d] to come to court" because he did not want to be seen as doing a significant favor for the U.S. government on the eve of Iraqi elections. The Government also represented that it learned Al-Dhari had applied for a visa to come to the United States and might arrive around the time the trial was scheduled to start. The Government explained that it had informed Al-Dhari that, if he came to this country, he would be expected to attend trial and the court could direct him to do so. The Government stated that it would monitor the situation, and the district court informed the parties that it would subpoena Al-Dhari if he arrived in the United States. On appeal, Oklah argues that Al-Dhari eventually postponed his trip, asked Whitson to update him on the trial's status, and came to the United States two weeks after the trial concluded.

Also relevant to Oklah's challenge to the use of Al-Dhari's deposition testimony, the Government filed its third CIPA motion the week before trial began and the district court approved the Al-Dhari substitution for disclosure. In full, the substitution read:

> A. For the purposes of this litigation, the United States Government acknowledges that, beginning no later than September 2004, Jamal Wahad Al-Dari was a commander in the Battalion of the 1920's Revolution Brigades.

> B. For the purposes of this litigation, the United States Government acknowledges that, in or about September 2004, Jamal Wahad Al-Dari was part of an insurgent group operating in the Al Anbar province of Iraq including in the city of Fallujah. For the

purposes of this litigation, the U.S. government also acknowledges that this insurgent group has posed as police officers to kidnap and rob Iraqi businessmen.

C. For the purposes of this litigation, the United States Government acknowledges that the priority of the 1920's Revolution Brigades was fighting multinational forces in Iraq, and that within the 1920's Revolution Brigades, a/k/a 1920's Revolution Battalion, Al-Dari played a political, religious, as well as military role.

The Government simultaneously produced to the defense documents from Al-Dhari's visa application file, including visa applications that he had submitted in 2016 and 2017 to travel to the United States and memoranda from consular officials seeking to waive his inadmissibility and to have his name removed from the "no-fly list" so he could travel to this country. The consular materials reflect that Al-Dhari applied for a visa around July 8, 2016, and notations indicate that the FBI initially told the State Department that it believed Al-Dhari's NGO was a "front for an insurgent organization in Iraq," and that Al-Dhari was a "mid-level leader" for the Brigades. But in October 2016, Al-Dhari met with the FBI and began corresponding with Agent Whitson. The next notation in Al-Dhari's visa file reflects that the FBI determined he was not a threat to aviation and anticipated he might testify at Oklah's trial, then scheduled for September 2017.

The file includes a request submitted by a consular officer in February 2017 seeking waiver of Al-Dhari's inadmissibility and no-fly status. Al-Dhari eventually

received permission to travel to the United States on March 7, 2017, to meet with members of Congress. The Government offered to stipulate to the admission of these belatedly disclosed documents at trial, but defense counsel chose to introduce only the visa records.

On January 29, the day before trial began, Oklah filed a renewed motion to strike Al-Dhari's testimony. This time, Oklah argued that the admission of Al-Dhari's deposition would violate his due process and confrontation rights because: (1) the Al-Dhari CIPA substitution showed that Al-Dhari had committed perjury at his deposition; (2) Oklah lacked an opportunity to cross-examine Al-Dhari about the late-produced visa applications and CIPA substitution; and (3) Al-Dhari was not unavailable. At a hearing on the motion, the Government offered to stipulate to admit the late-disclosed materials into evidence and the district court denied the motion to strike.

B.  Oklah's Confrontation Clause Challenges

On appeal, Oklah argues that the introduction of Al-Dhari's deposition at trial violated the Confrontation Clause because: (1) Al-Dhari's deposition was taken outside of Oklah's physical presence; (2) the Government failed to show that Al-Dhari was unavailable to testify at trial; and (3) Oklah lacked an adequate opportunity for cross-examination. We address each argument in turn.

The Sixth Amendment's Confrontation Clause "guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him." *United States v. Larson*, 495 F.3d 1094, 1102 (9th Cir. 2007) (en banc) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986)) (internal quotation marks omitted). The Clause protects a defendant's "right [to] physically . . . face those

who testify against him," *Coy v. Iowa*, 487 U.S. 1012, 1017 (1988) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987) (plurality opinion)), and prohibits the admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination," *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004).

We review de novo whether limitations on cross-examination are so severe as to amount to a violation of the Confrontation Clause, *United States v. Beardslee*, 197 F.3d 378, 383 (9th Cir. 1999), *amended on denial of reh'g*, 204 F.3d 983 (9th Cir. 2000), and whether the district court correctly construed the rule against hearsay and its exceptions, *United States v. Pena-Gutierrez*, 222 F.3d 1080, 1086 n.3 (9th Cir. 2000). We review the district court's underlying factual findings for clear error. *United States v. Spencer*, 592 F.3d 866, 878 (8th Cir. 2010); *United States v. Carson*, 455 F.3d 336, 362 (D.C. Cir. 2006) (per curiam).

### i. Physical confrontation

Al-Dhari's deposition was video-recorded in Latvia and played for the jury at trial. Oklah first contends that the use of the deposition at trial violated his right to physically confront Al-Dhari "face-to-face." He relies on *United States v. Carter*, 907 F.3d 1199 (9th Cir. 2018), where we held that "[c]riminal defendants have a right to 'physical, face-to-face confrontation at trial,' and that right cannot be compromised by the use of a remote video procedure unless [such procedure] is 'necessary' . . . and 'the reliability of the testimony is otherwise assured.'" *Id.* at 1202 (quoting *Maryland v. Craig*, 497 U.S. 836, 850 (1990)). Oklah argues that it was unnecessary to deprive him of his right to confront

Al-Dhari in person because Al-Dhari traveled to the United States before trial.

We agree with the Government that Oklah waived his physical confrontation challenge to the foreign deposition procedure because he voluntarily and knowingly agreed that the logistics used to preserve Al-Dhari's testimony satisfied Oklah's right to confrontation. *See United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc) (explaining that while forfeited issues are reviewable for plain error, waived issues are not reviewable). In a joint motion with the Government, Oklah stipulated that the parties' agreed-upon logistics for the foreign depositions would adequately protect his confrontation rights and that the video deposition furthered "the compelling government interest in prosecuting international terrorism." The joint motion represented that, "given the chance [the witnesses] may not be able to travel to the United States to testify at trial, foreign depositions are necessary for a just resolution of this litigation." Oklah also agreed that the parties' suggested arrangements for the overseas depositions protected his ability to participate, ensured that he and the witnesses could observe each other during the depositions, and would produce reliable testimony.[17] The joint motion concluded with a request that the court order the foreign depositions and that the "videotaped deposition testimony be used in lieu of live testimony at trial."

_____

[17] Oklah participated in Al-Dhari's deposition via video, with some defense lawyers physically present in Latvia with the witness and others present with Oklah in Arizona. Oklah was able to confer with his counsel in Arizona, and the record shows that counsel in Arizona was able to communicate and provide input to defense counsel in Latvia while the deposition was conducted.

On appeal, Oklah argues he did not waive his confrontation right both because his Confrontation Clause objection did not ripen until the Government sought to introduce Al-Dhari's deposition at trial, and also because the Government wrongfully obtained his consent to the joint motion by misrepresenting Al-Dhari's willingness and ability to travel to the United States.  Neither argument is persuasive.  Oklah agreed to deposition procedures specifically intended to preserve Al-Dhari's testimony *for later use at trial*, so his objection to the procedures comes too late.  Further, Oklah participated in the foreign deposition without objection, despite knowing that Al-Dhari had recently visited the United States.  Indeed, the defense conceded to the district court that it knowingly chose to forgo any physical-presence objection at the time of the deposition because Oklah wanted to conduct his own foreign deposition of Guo Xu.  Thus, the record shows that Oklah made a strategic decision to waive the objection he now advances.

Our decision in *United States v. Santos-Pinon*, 146 F.3d 734 (9th Cir. 1998), reinforces this conclusion.  There, a criminal defendant challenged the admission of videotaped testimony at trial, arguing that the government rendered the witness unavailable by deporting him to Mexico.  *Id.* at 736–37.  We held that the defendant waived his confrontation challenge because he failed to timely object to the witness's release to immigration authorities.  *Id.* at 736.  We noted that the district court's general order "clearly provide[d] for the opportunity to object" and gave notice that the witness was to be "released and deported absent an objection."  *Id.*  Given these circumstances, we concluded that allowing a defendant to preserve an objection to the release of the witness would place the government "in the impossible position of being

faced with an objection once it is too late to take any necessary corrective action." *Id.* at 736–37. We concluded the obligation to object arose before the defendant's confrontation rights were implicated at trial. *Id.* at 737 n.4.

*Santos-Pinon* governs. Oklah is correct that confrontation challenges ordinarily do not ripen until the government seeks to offer a hearsay statement at trial, *see United States v. Matus-Zayas*, 655 F.3d 1092, 1101 (9th Cir. 2011), but the record here leaves no room to doubt that Oklah voluntarily consented to, and participated in, the agreed-upon deposition and video-link procedure, knowing that the foreign deposition was meant to "preserv[e] testimony for possible subsequent use" at trial, *Santos-Pinon*, 146 F.3d at 737 n.4 (emphasis omitted) (quoting *United States v. Drogoul,* 1 F.3d 1546, 1554 (11th Cir. 1993)). Under these circumstances, the time to object to the plan to preserve the testimony of Al-Dhari and Ali-Ways through foreign depositions, and to permit the Government to "take any necessary corrective action" to address any interference with Oklah's right to physical confrontation, *id.* at 736–37, was before Al-Dhari's deposition occurred, *see Perez*, 116 F.3d at 845.

### ii. Unavailability

Oklah argues that the district court erred when it concluded that Al-Dhari was unavailable for trial. A witness is "unavailable" for purposes of the exception to the confrontation requirement only if "prosecutorial authorities have made a good-faith effort to obtain [the witness's] presence at trial." *Hardy v. Cross*, 565 U.S. 65, 69 (2011) (per curiam) (quoting *Barber v. Page*, 390 U.S. 719, 724–25 (1968)). That said, "[t]he law does not require the doing of a futile act," and "[t]he lengths to which the prosecution

must go to produce a witness . . . is a question of reasonableness." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980) (third alteration in original) (citation omitted), *abrogated on other grounds by Crawford*, 541 U.S. at 60. "'Good faith' and 'reasonableness' are terms that demand fact-intensive, case-by-case analysis, not rigid rules." *Christian v. Rhode*, 41 F.3d 461, 467 (9th Cir. 1994).

Here, Oklah argues, and the Government does not dispute, that a "heightened" standard of reasonableness applies to our evaluation of the Government's efforts to obtain Al-Dhari's presence at trial because the jury's assessment of Al-Dhari's testimony, and therefore his credibility, was exceptionally important to the Government's case and Oklah had strong confrontation interests at stake. *See, e.g.*, *United States v. Yida*, 498 F.3d 945, 960 (9th Cir. 2007); *Cook v. McKune*, 323 F.3d 825, 835 (10th Cir. 2003). Applying a "heightened" standard of reasonableness, we conclude the district court did not clearly err when it found that the Government made reasonable, good-faith efforts to secure Al-Dhari's presence at trial, and we find no error in the court's conclusion that the Government met its burden of showing that Al-Dhari was unavailable to testify.

Our decision in *United States v. Yida*, 498 F.3d 945, informs this inquiry.[18]   In *Yida*, a cooperating foreign-

---

[18] In *Yida*, we applied the standard for "unavailability" found in Federal Rule of Evidence 804(a)(5). That analysis also informs our resolution of Oklah's Confrontation Clause claim because Rule 804 "implements the command of the Sixth Amendment's Confrontation Clause." *Yida*, 498 F.3d at 950–51. *Yida* interpreted Rule 804's unavailability requirement consistently with the Confrontation Clause to avoid making "unnecessary constitutional decisions." *Id.* at 963 (Gould, J., concurring).

national witness pleaded guilty to conspiring with the defendant to import ecstasy, and the witness was eventually released to immigration authorities for deportation proceedings. 498 F.3d at 947. The government detained the witness for trial with a material-witness warrant, and his testimony turned out to be critical for the government's case. *Id.* at 947–48. After the witness testified in the criminal case, the jury reached an impasse, the district court declared a mistrial, and the witness's attorney asked the government to resume the witness's deportation proceedings. *Id.* at 948. The government obliged, having received assurances from the witness and his attorney that he would return to testify if asked. *Id.* The government deported the witness, but it did not notify the defense or the district court about its agreement with the witness or the resumed deportation proceedings. *Id.*

Before retrial in the drug conspiracy case, the government asked the witness to return to the United States, but he refused for medical reasons. *Id.* The government then moved to admit the witness's prior testimony. *Id.* at 949. The government argued that the witness was unavailable and that it had released the witness, who previously had been detained pursuant to a material-witness warrant, because of its concern for his due process right to not be subject to detention after he testified. *Id.* at 957. The district court denied the government's motion, and we affirmed its ruling. *Id.* at 947, 949. We ruled that the government failed to use "reasonable means" to secure the witness's appearance and fell short of its burden to establish that the witness was unavailable. *Id.* at 961.

Several factors informed our analysis in *Yida*. First, we reasoned that "[i]mplicit . . . in the duty to use reasonable means to procure the presence of an absent witness is the

duty to use reasonable means to prevent a present witness from becoming absent." *Id.* at 955 (alterations in original) (quoting *United States v. Mann*, 590 F.2d 361, 368 (1st Cir. 1978)). We acknowledged that "the appropriate time-frame for assessing the government's actions will vary, according to the specific facts presented," but we considered the government's conduct before the witness was deported because, during that interval, the government maintained control over the witness pursuant to the detainer and material-witness warrant. *Id.* at 955–56; *see United States v. Burden*, 934 F.3d 675, 687 (D.C. Cir. 2019) (explaining that analysis of "good-faith, reasonable efforts . . . should account for the good faith and reasonableness" of the government's conduct that first rendered the witness unavailable). We rejected the government's reliance on the witness's assurances that he would return because the witness was a convicted felon, and his earlier cooperation was coerced by his federal custody and the conditions of his plea agreement. *Yida*, 498 F.3d at 957–58.

We also rejected the government's argument that it had resumed the deportation proceedings out of concern for the witness's due process right not to be subject to undue detention because the government had detained him on a warrant for five months. *Id.* at 958. We reasoned that the fact the government held the witness for five months suggested it had concluded the witness was untrustworthy and unlikely to appear voluntarily. *Id.* *Yida* recognized that a witness has a due process interest that is implicated when he is held in custody before trial, especially when the detainee faces no criminal charges, is detained only as a material witness, or may be detained for an indefinite period. *Id.*; *see United States v. Eufracio-Torres*, 890 F.2d 266, 270 (10th Cir. 1989).

The outcome in *Yida* turned on the government's inability to explain why it suddenly weighed the witness's due process concerns more heavily against the risk of flight when it had previously chosen to detain the witness for five months. 498 F.3d at 958. Nor did the government persuasively argue that the witness was released due to concerns about detaining him indefinitely because the retrial was set for a date certain, and that date would not have implicated a prolonged delay. *Id.* Finally, *Yida* cited several alternatives to prolonged detention and deportation, including confiscating the witness's passport, serving a subpoena, imposing home confinement, or offering to take a video deposition with the defendant's participation to preserve the witness's testimony. *Id.* at 959–60.

Oklah criticizes the Government's conduct before and after Al-Dhari's foreign deposition. In his telling, the Government expended significant effort to obtain Al-Dhari's cooperation by assisting in his visa application process, meeting with him in Washington, D.C., and traveling overseas for his deposition, while the Government's efforts to *keep* Al-Dhari in the United States and within the court's subpoena power for trial were lackluster. More specifically, Oklah argues that the Government acted unreasonably by failing to notify defense counsel or the district court until June 2017 that Al-Dhari had traveled to the United States, failing to serve Al-Dhari with a subpoena while he was in the United States, and failing to arrest him as a material witness.

We agree with the district court that, in hindsight, the Government's representations in the joint motion about Al-Dhari's ability to travel to the United States were "arguably misleading." But, as discussed previously, the defense was aware, as of June 2017, that Al-Dhari had recently traveled

to the United States. The defense became aware of that fact after the parties filed their joint motion to elicit Al-Dhari's testimony, but *before* the Government took Al-Dhari's deposition. The joint motion and the district court's order made clear that the purpose of the deposition was to preserve Al-Dhari's testimony for trial.

Unlike the defendant in *Yida*, who was unaware of the witness's release and deportation, Oklah had an opportunity to object and argue that Al-Dhari should be required to appear for the initial target trial date in September 2017. Oklah did not do so. Instead, he made the strategic choice *not* to object because he wanted to conduct his own foreign deposition of his former employee in China and use that deposition at trial. Faced with the parties' agreement in the joint motion and Oklah's silence after learning that the Government met with Al-Dhari in Washington, D.C., the Government was not on notice that it had to make any additional effort to secure Al-Dhari's presence at the September 2017 trial.[19] *Cf. Burden*, 934 F.3d at 687

---

[19] Contrary to Oklah's arguments, the other factors in *Yida* reinforce our conclusion: Oklah argues the Government should have subpoenaed Al-Dhari for trial, but the subpoena would have been ineffectual after Al-Dhari left the country and, unlike the witness in *Yida*, Al-Dhari had strong due process interests in not being detained on a material-witness warrant or being kept in the United States because he was not charged with any crime. *Yida* does not support Oklah's suggestion that the Government was *required* to arrest Al-Dhari as an alleged co-conspirator or material witness because charging decisions fall squarely within the executive's prosecutorial discretion. *See, e.g.*, *Flagler v. Trainor*, 663 F.3d 543, 548 (2d Cir. 2011) ("Seeking a material witness order is within the prosecutor's 'function' as an advocate. A prosecutor employs prosecutorial discretion when determining whether to seek such an order."). In its briefing on appeal, the Government proffers several (cont.)

(explaining that when "the government *knew or should have known* of the potential need for the witness's testimony before he was deported, the government's duty to make good-faith, reasonable efforts to ensure the witness's presence arises before the witness leaves the United States" (emphasis added)).

The parties also dispute the adequacy of the Government's efforts to get Al-Dhari to return to the United States after the district court rescheduled the trial and ordered the Government to use its best efforts to secure his appearance. Oklah argues that the Government "actually warned" Al-Dhari not to return to the United States because, as of January 2018 (less than one month before the rescheduled trial), Al-Dhari had a pending U.S. visa application, a plane ticket, and a hotel reservation to travel to the United States during the first two weeks of trial. Oklah argues that, after speaking with the Government, Al-Dhari postponed his trip and later contacted Whitson and asked to be informed when Oklah's trial was over.[20]

---

reasons why it declined to charge Al-Dhari or seek his arrest, including the lack of forensic evidence against him, the likelihood that he would cease cooperating, and the potential detriment to U.S. foreign-policy objectives.

[20] Oklah did not raise any contemporaneous objection in response to Whitson's testimony that Al-Dhari contacted him to ask to be informed when the trial was completed. After trial, Oklah filed a Rule 33(b) motion arguing that Al-Dhari's post-trial travel to the United States in April 2018 was newly discovered evidence that, "particularly in light of Agent Whitson's testimony," demonstrated that Al-Dhari was not unavailable. The district court denied the Rule 33 motion because the evidence of Al-Dhari's travel to the United States would not result in an acquittal. On appeal, Oklah does not challenge the district court's order denying his Rule 33 motion.

Oklah fails to show that the district court clearly erred by finding that the Government made a good-faith and reasonable effort to obtain Al-Dhari's appearance at trial, after the trial court ordered the Government "to make every effort to secure [Al-Dhari's] presence at trial," and directed that, if he was "available to travel, [he] should be produced here." The following day, Government counsel explained that he had spoken with Al-Dhari "to ask that he come to court pursuant to the Court's direction," and Al-Dhari declined to come.

Oklah does not persuasively argue that the Government was required to do anything further after Al-Dhari refused to attend. He argues that the Government acted unreasonably because it "warned" Al-Dhari not to come to the United States, but the district court made no such finding. The court instead concluded that "the information and the explanation I have received as to why he is not going to be here is acceptable . . . without any contrary information or evidence." We accept the district court's factual finding about the Government's conduct during the call with Al-Dhari because it is not clearly erroneous.

When Government counsel learned from Al-Dhari that he had a pending visa application, counsel told him: "[T]hat's great. If you come for business, we expect you to come to court." Unlike the witness in *Yida*, Al-Dhari had cooperated with having his testimony recorded without any pending criminal proceeding against him. Oklah argues that Al-Dhari traded his testimony for the benefit of obtaining a visa to travel to Washington, D.C., but this argument overlooks that Al-Dhari participated at his deposition *after* he had been in the United States and had the opportunity to lobby members of Congress. A surprise subpoena or material-witness warrant while Al-Dhari was in the United

States may have caused Al-Dhari to refuse to cooperate with the planned deposition in the months that followed. Oklah cites no authority for the proposition that the Government was required to stop talking to Al-Dhari about testifying in person, or that by informing him that the court would require him to attend trial if he returned to the United States, the Government wrongfully procured Al-Dhari's unavailability.[21]

The district court did not err by concluding that the Government made a good-faith, reasonable effort to procure Al-Dhari's presence at trial, or by ruling that Al-Dhari was unavailable.

### iii. Right to effective cross-examination

Oklah argues that the admission of Al-Dhari's deposition at trial violated Oklah's confrontation rights because he lacked an adequate opportunity to cross-examine Al-Dhari about *Brady* impeachment material that the Government disclosed shortly before trial and after Al-Dhari's foreign deposition. The confrontation right includes "the right of effective cross-examination." *United States v. Kohring*, 637 F.3d 895, 905 (9th Cir. 2011) (quoting *United States v. Larson*, 495 F.3d 1094, 1102 (9th Cir. 2007) (en banc)). We are not persuaded by Oklah's challenge.

The parties deposed Al-Dhari in July 2017, but in January 2018 the Government disclosed the Al-Dhari CIPA substitution, Al-Dhari's 2016 and 2017 visa applications, and various State Department consular memos. Oklah

---

[21] Oklah also argues that the Government should have invoked a mutual legal assistance treaty and requested Latvia's assistance in compelling Al-Dhari to give live, video-linked testimony at trial. Because Oklah never requested this relief in the district court, this argument is forfeited.

argues that without these materials at the deposition, he was deprived of an opportunity to impeach Al-Dhari about: (1) Al-Dhari's statements that he received no benefit for his testimony and that he did not ask the FBI for help obtaining a visa to enter the United States; and (2) the response on Al-Dhari's visa application that he never had "served in, been a member of, or been involved with," among other things, an "insurgent organization" or "committed, ordered, incited, assisted, or otherwise participated" in "political killings[] or other acts of violence." Oklah contends that he would have impeached Al-Dhari with the visa applications because Al-Dhari testified that he supported the Brigades and, in the Al-Dhari substitution, the Government conceded that Al-Dhari was a Brigades leader with a military role.

The confrontation right protects a defendant's ability to cross-examine a witness about topics that "might reasonably" lead a jury to "question the witness's reliability or credibility." *Gibbs v. Covello*, 996 F.3d 596, 601 (9th Cir. 2021) (alteration accepted) (quoting *Fowler v. Sacramento Cnty. Sheriff's Dep't*, 421 F.3d 1027, 1036 (9th Cir. 2005)). Defense counsel may cross-examine to show potential bias and must be allowed "to make a record from which to argue why the witness might have been biased." *United States v. Schoneberg*, 396 F.3d 1036, 1042 (9th Cir. 2005) (alteration accepted) (emphasis omitted) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). We have "emphasized the policy favoring expansive witness cross-examination in criminal trials," *United States v. Cazares*, 788 F.3d 956, 983 (9th Cir. 2015) (quoting *Larson,* 495 F.3d at 1102), because the Sixth Amendment "commands . . . that reliability be assessed in a particular manner: by testing in the crucible of cross-examination," *Gibbs*, 996 F.3d at 602 (quoting *Crawford*, 541 U.S. at 61).

The Confrontation Clause guarantees "an *opportunity* for effective cross-examination," but it does not confer an unlimited right to "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Van Arsdall*, 475 U.S. at 679 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam)). Nor does the Confrontation Clause "require the government to disclose all documents that might be helpful on cross-examination." *United States v. Cardenas-Mendoza*, 579 F.3d 1024, 1030 (9th Cir. 2009); *see Ritchie*, 480 U.S. at 53 (plurality opinion) ("The ability to question adverse witnesses . . . does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony.").

Neither the Supreme Court nor our court has definitively determined whether the government violates a defendant's confrontation right by delaying the disclosure of impeachment materials that are necessary for the defendant to "confront the witnesses against him in a meaningful manner," *United States v. Collins*, 551 F.3d 914, 925 (9th Cir. 2009); *see, e.g.*, *Fenenbock v. Dir. of Corr.*, 692 F.3d 910, 916 n.5 (9th Cir. 2012) (explaining that this issue is "subject to dispute"), but we have generally assumed without deciding that such a claim is cognizable, *see, e.g.*, *Gibbs*, 996 F.3d at 605; *Collins*, 551 F.3d at 925.**[22]**

---

[22] We separately consider whether suppressed evidence affected a defendant's opportunity to cross-examine witnesses in the context of *Brady* claims, which sound in due process. For *Brady* claims, we ask whether there is a reasonable probability that, had the information been timely disclosed (and the cross-examination occurred), the result at trial would have been different. *See, e.g.*, *Sedaghaty*, 728 F.3d at 901–02; *Kohring*, 607 F.3d at 904–06; *United States v. Price*, 566 F.3d 900, 913–14 (9th Cir. 2009).

In the context of a Confrontation Clause challenge, the Supreme Court has stated that, to determine whether a defendant received an adequate opportunity for effective cross-examination, we ask whether "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680. "[T]he focus of the prejudice inquiry in determining whether the confrontation right has been violated must be on the particular witness, not on the outcome of the entire trial." *Id.* We consider how relevant the restricted cross-examination would have been and "whether the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness." *Larson*, 495 F.3d at 1103 (alteration accepted) (quoting *Beardslee*, 197 F.3d at 383)). That determination requires weighing other "information adduced through cross-examination" of the witness, but a "restriction on cross-examination cannot be justified by reference to other evidence a defendant presented." *Gibbs*, 996 F.3d at 602. Accordingly, whether a defendant's opportunity for cross-examination was sufficient for Confrontation Clause purposes "turns on the scope of the cross-examination that . . . [was] permitted." *Id.*[23]

---

[23] The government incorrectly suggests that Oklah's opportunity to admit the consular memos and visa application into evidence at trial vitiates any Confrontation Clause violation. We disagree. Oklah's ability to introduce that evidence at trial bears on our analysis of his *Brady* and *Napue* claims, but it does not represent a remedy that ends our Confrontation Clause inquiry. We assess the relevance of the unavailable consular materials and visa application by looking to the cross-examination that Oklah conducted at the deposition, and we ask (cont.)

Oklah first argues that the consular memos show that Al-Dhari received a significant benefit for his cooperation—removal from the no-fly list and waiver of his inadmissibility—and that Oklah's confrontation rights were violated because he was not able to cross-examine Al-Dhari about these benefits. The Government disputes Oklah's interpretation of the consular memos and argues that the memos show only that the consular officer requested Al-Dhari's removal from the no-fly list and a waiver of his inadmissibility because Al-Dhari was scheduled to meet with members of Congress.

Oklah's interpretation of the consular memos is supported by the record; the Government's is not. The consular memos and State Department processing materials strongly suggest that Al-Dhari's cooperation with the FBI positively affected his visa application. Notations in Al-Dhari's visa file between July and October 2016 show the FBI informed the State Department that Al-Dhari was connected to an Iraqi insurgent organization and that the FBI believed he was a mid-level leader in the Brigades. The State Department subsequently refused to grant Al-Dhari a visa. But after Al-Dhari met with Agent Whitson and other members of the FBI for an interview in Latvia in June 2016,

---

whether Oklah's cross-examination was so restricted that the jury did not have "sufficient information to assess the credibility of the witness." *Larson*, 495 F.3d at 1103 (quoting *Beardslee*, 197 F.3d at 383). As we explain, to the extent that Oklah lost the ability to cross-examine Al-Dhari in real-time about the consular memos and visa materials, this cross-examination at Al-Dhari's deposition would not have affected the jury's perception of his testimony in light of the cross-examination that Oklah was able to conduct.

the next State Department notation, dated November 2, 2016, states:

> [Redacted] Met with FBI agents from Phoenix who are at post talking with [Al-Dhari] about serving as key witness in a terrorism case, to testify in September 2017. FBI assesses he is not a threat to aviation. Applicant also plans trip to DC to meet with State and Hill contacts in winter-spring 2017. [Redacted].

The Consular Chief cited Al-Dhari's anticipated participation in Oklah's upcoming trial and Al-Dhari's opportunity to meet with the FBI during his March visit as grounds for waiving Al-Dhari's inadmissibility and removing him from the no-fly list. The Government is correct that the consular official also cited Al-Dhari's upcoming visits with members of Congress, but the Consular Chief expressly identified Al-Dhari's cooperation in Oklah's case as one ground for waiving his inadmissibility.

Nevertheless, we conclude that the information the defense had at the deposition to question Al-Dhari about his bias, related to the adjudication of his visa application, was sufficient to avoid violating the Confrontation Clause. Oklah argues that Al-Dhari testified falsely when he stated that he received no benefits in exchange for his agreement to testify. Even if Al-Dhari's agreement to testify prompted the Government to remove him from the no-fly list and grant his visa, Oklah failed to show that Al-Dhari *knew* about the Government's alleged motivation or that Al-Dhari testified falsely at the time of the deposition.

The consular memos hint at why Al-Dhari may have been biased, but the Government's pre-deposition disclosures provided stronger grounds for confronting Al-Dhari on that issue. Prior to Al-Dhari's deposition, the Government disclosed to defense counsel a series of emails between Al-Dhari and Agent Whitson, in which Whitson told Al-Dhari that he would monitor Al-Dhari's visa application, implied several times that he had or could get inside information about Al-Dhari's visa status, and suggested next steps (such as booking travel with a U.S. airline) to facilitate Al-Dhari's travel to the United States. Moreover, several of those emails showed that Al-Dhari believed Whitson had some level of involvement in the visa process because Al-Dhari repeatedly thanked Whitson for his "help in this visa case and other cases too"; said he "really appreciate[d] what [Whitson] [was] doing"; and "hope[d] [Whitson's] efforts w[ould] make changes with this situation."

Defense counsel acknowledged to the district court that, at the time of the deposition, the defense knew Al-Dhari "was having problems coming to the United States," and they were aware "Agent Whitson did something, sent an email, maybe bumped him up the priority line, you know, got his file perhaps to the top of somebody's desk off of the bottom so that things got moved a little bit faster." At the time of the deposition, the defense also knew Al-Dhari had a strong incentive to come to the United States to further his political ambitions, but Oklah apparently made a strategic decision to call a separate witness at trial to testify about this source of bias, rather than cross-examining Al-Dhari about his political activities. The defense also took the opportunity to cross-examine Al-Dhari about his relationship with Whitson.

Even after the Government produced the consular memos, the emails between Al-Dhari and Whitson, which the Government had produced before the deposition, remain the best evidence in the record of Al-Dhari's knowledge about the prosecution's ability to influence the visa approval process. Those emails provided more promising grounds for questioning the strength of Al-Dhari's pro-government bias. On this record, we are not persuaded that if Oklah had been able to cross-examine Al-Dhari about the late-produced consular materials, the cross-examination would have made a material difference in the jury's assessment of Al-Dhari.

Our precedent is in accord. In *Gibbs*, we upheld a California court's determination that belated disclosures would not have "materially enhanced the effectiveness of cross-examination" and concluded that because counsel had been permitted to question the witness about cash payments, it was unclear what more cross-examination about a "somewhat higher dollar amount" would have added. 996 F.3d at 605. In *Gibbs*, we concluded that the prosecution's late disclosures to the defense would have revealed that law enforcement found the witness to be an "unreliable informant." *Id.* Nonetheless, we held that the belated disclosures did not violate the Confrontation Clause because the defendants failed to explain what foundation existed for asking about those disclosures on cross-examination, and they did not argue that the witness was aware of law enforcement's opinion of him. *Id.* The same holds true here. Oklah does not explain why the consular materials shed light on what Al-Dhari knew about the reasons behind his visa approval, and Oklah had significant opportunities to impeach Al-Dhari with his pro-government bias.

Oklah separately argues, for the first time in his reply brief, that he was prevented from cross-examining Al-Dhari

about information in his visa application, including statements that Al-Dhari had not "served in, been a member of, or been involved with," an "insurgent organization" or "committed, ordered, incited, assisted, or otherwise participated" in "political killings[] or other acts of violence." Oklah forfeited this Confrontation Clause claim. *See, e.g.*, *Autotel v. Nev. Bell Tel. Co.*, 697 F.3d 846, 852 n.3 (9th Cir. 2012) ("[A]rguments raised for the first time in a reply brief are waived." (alteration in original) (citation omitted)).

But even if that claim were not forfeited, the Government's late disclosures did not deprive Oklah of an adequate opportunity to cross-examine Al-Dhari because the jury would not have "received a significantly different impression of [Al-Dhari's] credibility" had the defense asked about the statements on his visa application. *Van Arsdall*, 475 U.S. at 680. In his testimony, Al-Dhari openly admitted that he aided the Brigades, and he made clear that he was proud of his family's affiliation with the group. He was unequivocal in his statement that he believed the Brigades' violent activities were "very legal" and that the Brigades "had the right to do what [they] did," including using force to expel "the American invasion or occupation." Al-Dhari was also unequivocal in his support for Oklah—the jury heard testimony that he attempted to secure Oklah's release from detention in Turkey—and the record establishes that he continued to support Oklah even *after* he became aware Oklah had been involved in the manufacture of IEDs that killed and seriously injured U.S. troops. We are also skeptical that this line of questioning would have been helpful to Oklah's defense, given that tying Al-Dhari more closely to the Brigades likely would have tied Oklah himself more closely to the Brigades' actions.

We have also recognized that cross-examination attacking only the witness's "general credibility, not [his] bias," is less likely to change the jury's impression of a witness's credibility. *Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013); *see, e.g.*, *Evans v. Lewis*, 855 F.2d 631, 634 (9th Cir. 1988) ("[T]he defendant's right to attack the witness's general credibility enjoys less protection than his right to develop the witness's bias." (quoting *Reiger v. Christensen*, 789 F.2d 1425, 1433 (9th Cir. 1986))); *Hughes v. Raines*, 641 F.2d 790, 793 (9th Cir. 1981) (finding no Confrontation Clause violation when "[t]he object of the intended cross-examination in this case was not to establish bias against the defendant or for the prosecution; it merely would have been to attack the general credibility of the witness on the basis of an unrelated prior incident").

Even though Oklah lost the opportunity to question Al-Dhari about the visa statements during his deposition, we are not persuaded that this questioning would have made a difference to the jury's impression of Al-Dhari's testimony. Confronting Al-Dhari with his answer on the visa application might have provided another opportunity to attack his "character for truthfulness generally," but Oklah had substantial opportunities to cross-examine Al-Dhari about his pro-government bias, which "bore on [his] reliability and credibility in the specific context before the jury." *Fowler*, 421 F.3d at 1043. For example, the defense cross-examined Al-Dhari about the challenges he faced obtaining a visa to come to the United States, his freedom to travel around the United States when he visited, his political organizations, and his efforts to schedule meetings with members of Congress. Al-Dhari might well have explained that his denials on the application were correct because, in his view, the Brigades' defense of Iraq was justified.

Considering Al-Dhari's testimony as a whole, we are not persuaded that Oklah's ability to cross-examine Al-Dhari with the visa application and consular materials would have led the jury to question Al-Dhari's veracity or pro-government bias further, and we conclude that the belated disclosures did not deny Oklah the opportunity to cross-examine Al-Dhari effectively.

### iv. The Government's conduct at Al-Dhari's deposition

Oklah also argues that he lacked an adequate opportunity to cross-examine Al-Dhari about his bias because the Government refused to let Al-Dhari answer questions about his potential criminal exposure. We disagree.

The district court's order granting the parties' joint motion to take foreign depositions directed that "all evidentiary objections under United States law made during the proceedings will be noted and preserved for the Court as provided in Rule 15(f) of the Federal Rules of Criminal Procedure and Rule 30(c) of the Federal Rules of Civil Procedure." Federal Rule of Criminal Procedure 15(f) states: "A party may use all or part of a deposition as provided by the Federal Rules of Evidence." Federal Rule of Civil Procedure 30(c)(2) provides that objections "must be noted on the record, but the examination still proceeds . . . . A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)."

Oklah claims that the Government obstructed defense counsel's questioning by explicitly instructing Al-Dhari not to answer a pending question. The transcript refutes that claim. The record shows that defense counsel chose to

rephrase the question in response to an objection by the Government rather than waiting for Al-Dhari's answer. Because the government did not instruct the witness not to answer or in any other way interfere with defense counsel's questioning, Oklah did not show that the Government violated his right to confrontation by obstructing his examination of Al-Dhari.

## C. *Brady*/*Giglio* Challenges

Oklah also argues that the Government violated his due process rights by failing to disclose the Al-Dhari substitution, the consular memos, and Al-Dhari's visa application until shortly before trial. We review Oklah's *Brady*/*Giglio* challenges de novo. *See United States v. Liew*, 856 F.3d 585, 596 (9th Cir. 2017).

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In *Giglio*, the Court extended this principle to the suppression of evidence that impeaches a witness's credibility. 405 U.S. at 154–55. To establish a *Brady*/*Giglio* claim, a defendant must show that: (1) the evidence at issue would have been favorable to the accused, either because it was exculpatory or impeaching; (2) it was suppressed by the prosecution, either willfully or inadvertently; and (3) it was material. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Kohring*, 637 F.3d at 901.

Evidence is material within the meaning of *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding *would* have been different." *Ochoa v. Davis*, 16 F.4th 1314, 1327

(9th Cir. 2021) (emphasis added) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)), *cert. denied*, 143 S. Ct. 126 (2022); *see Kyles v. Whitley*, 514 U.S. 419, 434–35 (1995) (recognizing a *Brady* violation if undisclosed favorable evidence "undermines confidence in the outcome of the trial" (quoting *Bagley*, 473 U.S. at 678)).   There may be a "reasonable probability" of a different result "even where the remaining evidence would have been sufficient to convict the defendant." *Kohring*, 637 F.3d at 902 (citation omitted).  We consider the effect of suppressed evidence collectively.[24]  *Id.*

The Government does not dispute that the Al-Dhari substitution, the consular memos, and Al-Dhari's visa applications were favorable to Oklah's defense and that the Government had a duty to produce them pursuant to *Brady* and *Giglio*.  The Government argues that Oklah's materiality arguments fail because it produced this evidence before trial and "at a time when it still ha[d] value."  (alteration in original) (quoting *United States v. Houston*, 648 F.3d 806, 813 (9th Cir. 2011)).  Oklah disagrees and contends that he received this evidence too late to investigate or to confront Al-Dhari with it.

Because the relevant information *was* eventually disclosed to the defense:

> [O]ur inquiry on appeal is not whether the evidence, had it been disclosed, might

---

[24] "The terms 'material' and 'prejudicial' are used interchangeably in *Brady* cases." *Sivak v. Hardison*, 658 F.3d 898, 911 n.3 (9th Cir. 2011) (quoting *Benn v. Lambert*, 283 F.3d 1040, 1053 n.9 (9th Cir. 2002)).  For *Brady* purposes, evidence is not "material" unless the failure to produce it is "prejudicial," and not "prejudicial" unless the failure to produce it is "material." *See id.*

> reasonably have affected the jury's judgment
> on some material point. Rather, it is whether
> the *lateness* of the disclosure so prejudiced
> appellant's preparation or presentation of his
> defense that he was prevented from receiving
> his constitutionally guaranteed fair trial.

*United States v. Miller*, 529 F.2d 1125, 1128 (9th Cir. 1976) (emphasis added). If the defendant is presented with a substantial opportunity to use the belatedly disclosed evidence, there is no prejudice. *See United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988); *United States v. Shelton*, 588 F.2d 1242, 1247 (9th Cir. 1978) ("There can be no claim of prejudice insofar as the defendant was enabled to present to the jury favorable or impeaching evidence."). We conclude that Oklah had a substantial opportunity to use the evidence, so these *Brady* claims fail.

Oklah argues that he was deprived of an opportunity to investigate the belatedly disclosed evidence. Our case law has recognized that a continuance granted for the purposes of preparation and investigation will often remedy any prejudice to the defendant's case resulting from late-disclosed evidence. *See, e.g.*, *United States v. Gamez-Orduño*, 235 F.3d 453, 461–62 (9th Cir. 2000); *see also United States v. Mathur*, 624 F.3d 498, 506 (1st Cir. 2010).

Here, a continuance might have allowed Oklah to engage in some follow-up investigation into the late-disclosed documents, but a continuance likely would not have allowed Oklah the opportunity to cross-examine Al-Dhari because Al-Dhari did not return to the United States until a few weeks after trial concluded. Nevertheless, we recognize that, "[w]here the withheld evidence opens up new avenues for impeachment, it can be argued that it is still material"

even when the defense has already introduced other impeachment evidence. *Gonzalez v. Wong*, 667 F.3d 965, 984 (9th Cir. 2011).

This claim fails because Oklah has not shown that the defense's ability to cross-examine Al-Dhari about the visa materials would have left the jury with a materially different impression of Al-Dhari. The jury already knew that Al-Dhari supported the Brigades and that he had a strong incentive to cooperate with the Government so that he could travel to Washington, D.C., to lobby members of Congress. The Government also agreed to stipulate to the admission of these documents, so Oklah had an *opportunity* to present this evidence to the jury and to argue its relevance. Had he done so, the Government would not have had the ability to rehabilitate Al-Dhari because he was not available to be recalled at trial.

Even if the ability to challenge Al-Dhari with this evidence in real time would have added to the reasons the jury had to doubt Al-Dhari's credibility, key parts of Al-Dhari's testimony were corroborated by Ali-Ways' testimony, including Ali-Ways' statements that Oklah shipped IED components from China to Iraq, including DTMF-11 boards; that Oklah sent IED components to Abu Ghassan; and that Oklah indicated the components were for the Brigades' use. *See Hovey v. Ayers*, 458 F.3d 892, 920 (9th Cir. 2006) ("That Lee's testimony corroborated [testimony] given by Hughes makes it unlikely that the jury would have discounted Hughes's testimony altogether, absent some impeachment information of an entirely different kind than that actually presented.").

The defense did not cross-examine Ali-Ways at his deposition or argue that it would have used the late-produced

evidence to do so. Apart from Ali-Ways' confusion about whether a photo on his laptop was of his friend or of Oklah, Oklah identifies no other ground for the jury to disbelieve Ali-Ways' testimony. Finally, the email communications among Oklah, Al-Dhari, and Ali-Ways further corroborated Al-Dhari's and Ali-Ways' testimony implicating Oklah in the conspiracy. In sum, the belated *Brady*/*Giglio* disclosures did not prejudice Oklah's defense.

### D. *Napue* Challenges

Invoking the Supreme Court's opinion in *Napue v. Illinois*, 360 U.S. 264, Oklah argues that the Government knowingly used false testimony when it introduced Al-Dhari's recorded deposition at trial because Al-Dhari lied: (1) when he testified that he did not ask the FBI to help him obtain a U.S. visa; (2) when he testified that he received no benefits from the Government in exchange for his cooperation; (3) when he misrepresented his role in the Brigades as familial, tribal, and limited to financial funding; and (4) when he described the Brigades' primary goal as resisting the American occupation. We review de novo Oklah's *Napue* claims. *United States v. Renzi*, 769 F.3d 731, 751 (9th Cir. 2014).

The government violates a defendant's due process rights by obtaining a conviction through the knowing use of false testimony. *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013). The government has a constitutional obligation to correct false evidence even if it did not solicit it. *Hayes v. Brown*, 399 F.3d 972, 983–84 (9th Cir. 2005) (en banc); *see Napue*, 360 U.S. at 269. These principles are not limited to direct evidence of a defendant's guilt; they also apply to testimony that "goes only to the credibility of the witness" because "[t]he jury's estimate of the truthfulness and

reliability of a given witness may well be determinative of guilt or innocence." *Napue*, 360 U.S. at 269.

To establish a *Napue* violation, Oklah must show: (1) that the testimony or evidence presented at trial was "actually false" or misleading; (2) that the Government knew or should have known that it was false; and (3) that the testimony was material, meaning that there is any "reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Renzi*, 769 F.3d at 751 (emphasis added) (quoting *Houston*, 648 F.3d at 814).[25]

Our materiality inquiry examines the "cumulative effect" of all false and misleading evidence and testimony presented at trial, *Killian v. Poole*, 282 F.3d 1204, 1209 (9th Cir. 2002), as well as the effect of the prosecutor's hypothetical correction of the false testimony in front of the jury, *see, e.g.*, *Sivak*, 658 F.3d at 916 (explaining that had a witness's lies "been exposed," the jury likely would have rejected the remaining testimony); *Jackson v. Brown*, 513 F.3d 1057, 1077 (9th Cir. 2008) (examining "the impeachment value that the prosecutor's correction of [the witness's] testimony could have served" and "reject[ing] the State's arguments that [the witness's] revealed perjury would have had little impact on the jury").

At the outset, the record does not support Oklah's suggestions that Al-Dhari agreed to testify *in exchange* for

---

[25] The *Napue* standard for materiality is notably less demanding than the materiality standard for *Brady* claims, which asks whether there is a reasonable probability that the result of the proceeding "would" have been different had the materials been disclosed. *See Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008) (describing the different standards and explaining the process for analyzing *Brady* and *Napue* errors in tandem).

the FBI's agreement to help him obtain a visa and that his description of the Brigades' primary goal was dishonest. Oklah makes a stronger showing that the Government failed to correct Al-Dhari's testimony that he did not receive benefits and that Al-Dhari misrepresented his role in the Brigades. We assume, without deciding, that Al-Dhari's testimony on those subjects was false but conclude that these purported *Napue* violations, considered collectively, do not show a reasonable likelihood that the testimony could have affected the jury's determination.

Oklah has failed to show that Al-Dhari lied when he testified that he did not ask the FBI to assist him with obtaining a United States visa. Oklah argues that this testimony was false because the FBI "expressly requested Al-Dhari be granted a waiver of his inadmissibility and removed from the no-fly list to secure him a U.S. visa." But the consular materials do not show that Al-Dhari *asked* the FBI to assist him. The only other evidence in the record about Al-Dhari's communications with the FBI is contained in the emails exchanged between Whitson and Al-Dhari, and Whitson's trial testimony. The emails show Al-Dhari thanking Whitson, and they certainly suggest that Al-Dhari thought that Whitson could assist him, but Oklah cites no record evidence in the emails or testimony establishing that Al-Dhari asked the FBI to help him obtain his U.S. visa.

Oklah separately argues that Al-Dhari lied when he testified that the Brigades were primarily focused on resisting the American occupation. In support, Oklah relies on the Al-Dhari substitution in which the Government conceded that the Brigades' goal was to expel "multinational forces"—i.e., not just Americans. Oklah also argues that the evidence showed that the Brigades targeted Al-Qaeda. We are not persuaded. The Government's acknowledgment in

the substitution that the Brigades were fighting "multinational forces" does not establish that Al-Dhari testified falsely. To the contrary: the evidence showed that the U.S. military was the main component of the multinational force that the Brigades were attempting to expel. The Government also presented expert testimony at trial establishing that the Brigades had a unique and persistent focus on expelling American forces from Iraq and that, to the extent separate factions split off from the Brigades to assist in the fight against Al-Qaeda, those factions did not use IEDs. Al-Dhari's statements about the Brigades' goals were consistent with this other evidence. At most, Al-Dhari's testimony was "inaccurate or rebuttable," which is not enough to support a *Napue* claim.[26] *See Henry*, 720 F.3d at 1084; *see also Renzi*, 769 F.3d at 752.

Oklah next argues that the Government violated *Napue* by presenting Al-Dhari's testimony about his role in the Brigades. In his deposition, Al-Dhari equivocated about his role in the group, saying, among other things, that the Brigades was an "armed resistance" and that individuals outside of Iraq (which would include Al-Dhari) were not members of the "armed movement." But at other points in his testimony, Al-Dhari admitted to aiding the Brigades

---

[26] In a footnote, Oklah asserts that Al-Dhari wrote an article that appeared during trial in which he stated that he "fought Al-Qaeda on the battlefield during the Anbar Awakening." Assuming that Al-Dhari did write the article, Oklah has not shown that he raised the article in the trial court, or that his testimony about the Brigades' role was false or misleading.

inside *and* outside of Iraq.[27]   The Government acknowledged in the CIPA substitution that Al-Dhari was a

---

[27] The relevant portions of Al-Dhari's deposition testimony include the following exchanges:

> [Government Counsel] Q. What, if anything, did you do to assist the 1920 Revolution Brigades?
>
> [Al-Dhari] A. I do, first of all, my duties to Iraq when we face occupation. And the Brigade of 1920, it was Iraqi revolution.  For that, I present all what I'm able to—to present.
>
> . . . .
>
> Q. And were you yourself a member of the 1920 Revolution Brigades?
>
> A. The 1920 Revolutionary Brigade is armed resistance.
>
> Q. And were you yourself a member of the group?
>
> Could you repeat the question?
>
> A. My answer was: The people in that 1920 Revolutionary Brigade are an armed movement, which means that the people outside of Iraq are not a member of the armed movement.
>
> Q. Mr. Al-Dhari, how did you know what the objectives of the 1920 Revolution Brigades were?
>
> A. Because—because 1920 Revolutionary Brigade, their goals were announced and written and also—
>
> INTERPRETER: Please continue.
>
> THE WITNESS: And that's through direct connection between individuals.  And because I am a member from al-Dhari family, we consider ourself as honored to be from the family of 1920 Revolutionary Brigade.

(cont.)

"commander" and that he played a "a political, religious, as well as military role" in the Brigades.

Even assuming that Al-Dhari's testimony was untruthful or misleading about his role in the Brigades and that the Government was aware his testimony was false or misleading, Oklah has not shown that this purported *Napue* violation could have made a difference in the trial. First, it is possible that Al-Dhari's role as a military leader in the Brigades could have been helpful evidence to the Government's case because the Government theory was that Al-Dhari was one of the key Brigades co-conspirators. Indeed, the Government argued in closing, over defense objection, that Al-Dhari would "do whatever he could for the Brigades . . . to use IEDs to attack the United States soldiers." Given that Al-Dhari's testimony made clear that he was proud of his assistance to the Brigades, an additional revelation about Al-Dhari's greater role in the Brigades was unlikely to change the jury's view of Al-Dhari.

Nor does Oklah establish that additional evidence that Al-Dhari received benefits from the Government in

---

We are, as a family, we considered ourself as a part of 19 Revo—1920 Revolutionary Brigade.

BY [government counsel]:

Q. A moment ago, you described the types of assistance you provided to the 1920 Revolution Brigade. Did that assistance occur both inside Iraq as well as outside Iraq?

A. Yes.

Later, on cross-examination, Al-Dhari acknowledged that he was "a sheikh of a tribe," but he denied that the Brigades gave him a title based on his "role and assistance to them."

exchange for his testimony could have had a material effect on the outcome of the trial. Oklah argues that the consular memos show that Al-Dhari received benefits for his cooperation (removal from the no-fly list and a waiver of his inadmissibility) and that Al-Dhari's testimony to the contrary materially affected the trial because the jury sent a note to the trial judge asking, "What benefits did [Al-Dhari] receive from U.S.[?]"[28] This *Napue* claim fails because Oklah has not identified any evidence that Al-Dhari knew of the FBI's input to the State Department concerning his visa application and his status on the no-fly list. Because Oklah has not established that Al-Dhari's testimony on this point was untruthful, this *Napue* claim falters at step one.

Even if we infer that Al-Dhari knew about the FBI's involvement in his visa process, the defense had ample opportunity to question Al-Dhari about his relationship with the FBI, to introduce his visa materials (the government stipulated to their admissibility), and to argue to the jury, as he does on appeal, that the Government "rolled out the red carpet" for Al-Dhari by allowing him to travel to the United States, by buying an expensive dinner for him when he met with the FBI in Washington, D.C., and by facilitating his meetings with members of Congress. In short, the jury had substantial reasons to infer that Al-Dhari was biased in favor of the Government to further his own political interests, and the defense argued Al-Dhari's bias to the jury in its closing argument. Oklah has not shown that hearing more about the benefits Al-Dhari hoped to receive from the Government

---

[28] The district court instructed the jury to "consider the evidence presented in Court to answer those questions . . . and . . . it's your memories of that evidence that governs."

could have affected the jury's impression of Al-Dhari or the outcome of the trial.

Moreover, Al-Dhari's testimony was substantially corroborated by other evidence in the record;[29] that is the most important consideration in our overall materiality analysis for the *Napue* claims. Oklah argues that Al-Dhari's false statements were material because his testimony "was the only evidence" connecting Oklah to the Brigades' IED operations against U.S. forces. That is plainly wrong. There was a great deal of evidence collected from the Omar site that connected Oklah to the manufacture of IEDs used against American forces, including identification documents bearing Oklah's photo and fingerprints and IED components bearing Oklah's fingerprints. Contrary to Oklah's arguments that the Omar site contained the leftover inventory from his innocuous electronics shop, the evidence also included a document describing how to use a cell phone to detonate an explosive device.

As explained, Al-Dhari's most significant inculpatory statements were that Oklah shipped IEDs from China to the Brigades and Abu Ghassan, and this testimony was corroborated by Ali-Ways' testimony and by emails admitted at trial. The defense did not cross-examine Ali-Ways who, despite confusing a photo of a different Brigades member with a photo of Oklah, did not equivocate when he testified that Engineer Diya (Oklah) sought out Abu Ghassan's replacement; displayed a gray-colored box for Hamdan, the Brigades' replacement-leader, that Oklah

---

[29] Unlike the materiality analysis for Oklah's Confrontation Clause claim, *Napue* requires that we consider the "cumulative effect" of all false and misleading testimony in light of the other evidence presented to the jury. *Killian*, 282 F.3d at 1209.

explained was for "explosions"; shipped IED components from China; and sent electronic components for Abu Ghassan and the Brigades' use.

Al-Dhari's and Ali-Ways' testimony was further corroborated by Oklah's emails explaining how to protect cell phone conversations from surveillance while discussing "the resistance"; Oklah's email confirmation to Al-Dhari and Ali-Ways that Oklah was sending 10 transmitters and 100 receivers from China (as Al-Dhari explained, this was a necessary ratio because more receivers were destroyed in explosions); and Oklah's emails about electronics and DTMF boards. Finally, the Government presented extensive forensic evidence tying Oklah to the Omar and Amiriya sites, where investigators seized component parts for IEDs similar to those used by the Brigades. In short, Oklah has not shown a reasonable likelihood that any purported *Napue* violations, even considered collectively, could have affected the verdict.

E.   Statements in Furtherance of the Conspiracy

Over Oklah's objection, the district court admitted Al-Dhari's testimony in which he repeated statements made by Harith Al-Dhari, who was killed by Al-Qaeda in 2007.[30] The district court admitted these statements as statements made by a co-conspirator. Oklah argues that the district court abused its discretion by admitting Al-Dhari's

---

[30] For example, the Government asked Al-Dhari whether Oklah used his technical background to "improve the explosive devices," and Al-Dhari responded, "I heard from Harith that [Oklah] was helping in doing that." The Government also asked Al-Dhari if he had any conversations with Oklah about the remote controls used for IEDs, and Al-Dhari testified: "I'm not an engineer, but—but I know through general conversation with Harith that [Oklah] was helping in this matter."

testimony because the Government failed to establish that Harith's statements were made in furtherance of a conspiracy.

We review for abuse of discretion the district court's decision to admit co-conspirator statements, and we review for clear error the district court's underlying factual determinations that a conspiracy existed and that the statements were made in furtherance of that conspiracy. *United States v. Saelee*, 51 F.4th 327, 339 n.4 (9th Cir. 2022).

Under Federal Rule of Evidence 801(d)(2)(E), the statement of a co-conspirator is admissible against a defendant if the government shows by a preponderance of the evidence that: (1) "a conspiracy existed at the time the statement was made"; (2) "the defendant had knowledge of, and participated in, the conspiracy"; and (3) "the statement was made in furtherance of the conspiracy." *United States v. Bowman*, 215 F.3d 951, 960–61 (9th Cir. 2000) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)). "Narrations of past events are inadmissible, but expressions of future intent or statements that 'further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy' are admissible under Rule 801(d)(2)(E)." *Id.* at 961 (quoting *United States v. Yarbrough*, 852 F.2d 1522, 1535 (9th Cir. 1988)).

When a district court evaluates whether a particular statement qualifies as a statement made in furtherance of a conspiracy, "[t]he statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it." Fed. R. Evid. 801(d)(2). Accordingly, the government "must produce some independent evidence which, viewed in light of the coconspirator statements,

establishes the requisite connection between the accused and the conspiracy." *Saelee*, 51 F.4th at 342 (quoting *United States v. Castaneda*, 16 F.3d 1504, 1507 (9th Cir. 1994)). The independent evidence of the conspiracy must be such that, taken together with the alleged co-conspirator statement, the statement can fairly be said to be incriminating. *Id.* But the government "need show only a slight connection with the conspiracy." *Id.* (quoting *Castaneda*, 16 F.3d at 1507).

The Government alleged that a conspiracy existed among Oklah, Al-Dhari, Harith, Ali-Ways, Abu Ghassan, and other members of the Brigades. Oklah contends that Harith's statements did not further the conspiracy because Al-Dhari claimed that he was not a member of the Brigades, and therefore was not a member of the conspiracy. We agree that Al-Dhari arguably disclaimed membership in the Brigades in his deposition testimony, but the Government presented ample evidence that he in fact was a Brigades member who took numerous steps to further the group's goals: Al-Dhari admitted that he supported the Brigades' financial, medical, and logistical needs; he testified that he helped Oklah get a visa to travel to China; and the jury heard evidence showing that Oklah copied Al-Dhari on an email that Oklah sent to the Brigades in which he discussed an order of IED components. Al-Dhari testified that Harith introduced him to Oklah, the evidence showed that Al-Dhari knew Oklah was a member of the Brigades, and Al-Dhari testified that he helped Oklah after learning that Oklah had manufactured IEDs for the Brigades. Harith's statements to Al-Dhari "further[ed] the common objectives of the conspiracy." *Bowman*, 215 F.3d at 961 (quoting *Yarbrough*, 852 F.2d at 1535).

Even if Brigades members did not consider Al-Dhari to be a member of the conspiracy, we have held that "[i]t is not necessary that the statement be made to another member of the conspiracy for it to come under rule 801(d)(2)(E). To be 'in furtherance' a statement must advance a common objective of the conspiracy or set in motion a transaction that is an integral part of the conspiracy." *United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993) (citation omitted) (allowing a third-party witness to testify, in a drug prosecution, that a deceased co-conspirator asked whether the witness wanted to buy drugs); *United States v. Zavala-Serra*, 853 F.2d 1512, 1516 (9th Cir. 1988) (rejecting argument that the defendant's statement to a government informant could not be in furtherance of a conspiracy because "[i]t is well established that statements made by a co-conspirator need not be made to a member of the conspiracy to be admissible under rule 801(d)(2)(E)"). Harith's statements satisfy the required standard because, as explained, they were made in furtherance of the Brigades' objectives.

Oklah next suggests that it is not apparent that "Harith made the statements while the conspiracy was ongoing and not at some later date." This argument fails because Harith made his statements before his death in 2007, and Al-Dhari and Ali-Ways testified that Oklah's conspiracy with the Brigades lasted through 2009 or 2010.

Oklah also contends that Harith's statements were the "exclusive evidence" of Oklah's involvement in the conspiracy and that the Government failed to present "some additional proof" that Oklah knew of and participated in the conspiracy. *See United States v. Silverman*, 861 F.2d 571, 578 (9th Cir. 1988). This argument is contradicted by the record because Ali-Ways' testimony and the emails admitted

at trial, including an email that Oklah sent Al-Dhari and Ali-Ways with a list of IED components, tied Oklah to the Brigades' plans to use—and actions to implement the use of—IEDs.

Oklah further argues that the district court erred by admitting statements about Oklah manufacturing IEDs that Al-Dhari claimed he heard in "general conversation" with Harith because such statements could not have been made "in furtherance of the conspiracy." This theory falters because Harith's descriptions to Al-Dhari of Oklah's role in the Brigades were "statements made to keep [a] coconspirator[] abreast of [the] ongoing conspiracy's activities," *United States v. Tamman*, 782 F.3d 543, 553 (9th Cir. 2015) (citation omitted), or were made to further the Brigades' objectives, and thus plainly fall within the Evidence Rule 801(d)(2)(E) co-conspirator hearsay exemption.

Last, Oklah suggests there was insufficient evidence of Al-Dhari's participation in the conspiracy at the time he spoke to Harith. We disagree. Al-Dhari testified that he assisted the Brigades inside and outside Iraq between 2005 and 2010, and in his trial testimony he associated himself with the founding of the modern iteration of the Brigades.

The district court did not abuse its discretion by admitting Al-Dhari's testimony recounting Harith's statements because Harith made the statements in furtherance of the Brigades' conspiracy.

## IV. Emails Exchanged with FBI Agent Whitson

Oklah argues that the district court erroneously excluded emails between FBI Special Agent Whitson and Al-Dhari as hearsay because the emails contained statements that were

relevant for non-hearsay purposes. Whitson was the "primary point of contact" between the Government and Al-Dhari "for matters related to this case." After Whitson testified on direct examination that Al-Dhari was a member of the Brigades and helped finance the group, defense counsel unsuccessfully sought to admit more than 200 pages of emails between Whitson and Al-Dhari on cross-examination.

We review de novo the district court's interpretation of the hearsay rule, but review for abuse of discretion preserved objections to the exclusion of evidence as hearsay. *United States v. Town of Colorado City*, 935 F.3d 804, 807 (9th Cir. 2019). To obtain relief, a party appealing from the exclusion of evidence must show that an erroneous evidentiary ruling "more likely than not affected the verdict." *United States v. Moalin*, 973 F.3d 977, 1003 (9th Cir. 2020) (quoting *United States v. Pang*, 362 F.3d 1187, 1992 (9th Cir. 2004)). We review for plain error unpreserved objections to evidentiary rulings. *See United States v. Gomez-Norena*, 908 F.2d 497, 500 (9th Cir. 1990).

When the Government objected to the Whitson–Al-Dhari emails on hearsay and vagueness grounds, defense counsel offered a number of responses. Defense counsel argued that the emails were relevant and admissible for "impeachment," "to show the nature," "to show that [Whitson] hoped to see [Al-Dhari] in the United States," "to establish when [Whitson] communicates with targets that his statements are not going to be taken as literally true," to show "that these are communications designed to provoke a response," and "to prove that the conversation took place."

On appeal, the defense argues that the Whitson emails were admissible because they showed "bias," "motive," or

an "effect on Al-Dhari," but Oklah failed to raise any of those theories of admissibility to the district court. Ultimately, the court sustained the Government's hearsay objections but allowed defense counsel to elicit testimony that Al-Dhari and Whitson exchanged numerous emails in which they interacted in a friendly manner, including while Al-Dhari was in the United States.

Defense counsel failed to identify an applicable non-hearsay ground—such as the effect on the listener—under which some of Whitson's statements in emails may have been admissible, nor did the defense seek to admit a more tailored selection of the emails. Rather, as noted, the defense filed a notice in the district court seeking to admit more than 200 pages of email correspondence between Whitson and Al-Dhari to establish Al-Dhari's "motive for cooperating with the United States." The arguments regarding a non-hearsay purpose come too late. *See United States v. Sims*, 617 F.2d 1371, 1377 (9th Cir. 1980) ("The presentation of additional evidentiary theories on appeal is inconsistent 'with the salutary purpose of the timeliness requirement to allow the trial judge to make an informed ruling based on the issues as framed by the parties before the evidence is . . . excluded.'" (omission in original) (quoting *United States v. Lara-Hernandez*, 588 F.2d 272, 274 (9th Cir. 1978))).[31]

Even if Oklah had made an offer of proof sufficient to preserve these objections, we see no colorable argument that the exclusion of the emails more likely than not affected the

---

[31] *See also* Robert P. Mosteller et al., *McCormick on Evidence* § 51 (8th ed. 2020) ("If the proponent counsel specifies a purpose for which the proposed evidence is inadmissible and the judge excludes, counsel cannot complain of the ruling on appeal although the evidence could have been admitted for another purpose.").

jury's verdict.  Whitson provided extensive live testimony that made the jury aware of his flattery of and friendliness with Al-Dhari.  On appeal, Oklah has not identified any specific portions of the excluded emails that would have had significantly higher impeachment value than Whitson's statements at trial.  Because Oklah has not satisfied the lower standard for preserved objections to evidentiary rulings, he necessarily cannot show plain error, as required to obtain reversal based on the trial court's decision not to admit the compilation of the Whitson–Al-Dhari emails.

## V.  Christopher Graham's Expert Testimony

Oklah argues that the district court abused its discretion by admitting Christopher Graham's testimony, and by refusing to grant a mistrial or to strike Graham's testimony, because the Government violated then-governing Federal Rule of Criminal Procedure 16[32] and the Due Process Clause

---

[32] In April 2022, Federal Rule of Criminal Procedure 16(a)(1)(G) was amended to "ensure that parties receive adequate information about the content of the witness's testimony and potential impeachment." Fed. R. Crim. P. 16 advisory committee's note to 2022 amendment.  These changes took effect December 1, 2022, long after the conclusion of district court proceedings in this case. *See Proposed Amends. to Fed. R. Crim. P. 16*, 340 F.R.D. 810, 811 (2022) (specifying that the amended rule "shall govern in all proceedings in criminal cases [commenced after December 1, 2022] and, insofar as just and practicable, all proceedings then pending," but making no provision for retroactive application); *see also United States v. Mercado*, 349 F.3d 708, 710 (2d Cir. 2003) (Sotomayor, J.) ("[T]he determination as to whether to apply a new procedural rule in a pending case involves consideration of the effect, if any, that the rule will have on substantive rights, in light of the expenditure of judicial resources and the inconvenience to the parties that may result from the retroactive application of the new rule."). Oklah has not argued that the newly amended Rule 16(a)(1)(G) applies retroactively to his case on direct review.

by failing to disclose Graham's opinions and their bases before trial; and because Graham's opinions were not reliable as required by Federal Rule of Evidence 702. The Government called Graham at trial to provide expert testimony on the Government's physical evidence. The district court concluded that Graham was "qualified to offer opinions regarding the likely intent of the components found at the Omar Street site," and on appeal Oklah does not contest Graham's qualifications. We review for abuse of discretion the district court's discovery and evidentiary rulings under Rules 16 and 702, but review de novo claims of embedded legal or constitutional error. *See United States v. Holguin*, 51 F.4th 841, 852 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 2509 (2023); *United States v. Mohamud*, 843 F.3d 420, 432 (9th Cir. 2016). We review for abuse of discretion denial of a motion for mistrial. *United States v. Gallenardo*, 579 F.3d 1076, 1081 (9th Cir. 2009).

A. Federal Rule of Criminal Procedure 16

At the time of the pretrial discovery in Oklah's case, Rule 16(a)(1)(G) required the government to provide, at the defendant's request, "a written summary of any [expert] testimony," describing: (1) "the witness's opinions"; (2) "the bases and reasons for those opinions"; and (3) "the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G) (2018). The purpose of this provision was "to permit more complete pretrial preparation by the requesting party" and to "provide a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment. The provision was "not intended to create unreasonable procedural hurdles." *Id.*

Oklah contends that the district court abused its discretion by admitting Graham's expert testimony because Graham's testimony was inconsistent with the Government's pretrial disclosures, which included 68 unsigned reports from the FBI's Terrorist Explosive Device Analytical Center (TEDAC), in which the FBI analyzed the physical evidence collected from Omar and Amiriya. We agree that the Government initially produced a vague notice and voluminous and disorganized disclosures (including the TEDAC reports) that the district court described as "bare conclusions and enormous data dumps." But the district court ordered the Government to provide revised notices that more specifically summarized the testimony of the Government's experts, in line with Rules 16 and 702. On appeal, the parties agree that the Second Renewed Notice (SRN), filed January 5, 2018, was the operative expert disclosure for Graham's testimony at trial.

In five pages comprising approximately 1,500 words, the relevant portion of the SRN set forth Graham's qualifications, summarized his opinions and the bases for them, and explained why his testimony would be reliable and relevant. The SRN specifically disclosed Graham's opinions that "[t]he Omar Street site was an IED switch factory," that certain "modified components implied research and development for IED switches," and that "Omar Street was very significant because of both the size . . . and the recovery of several unusual items." The SRN also noted that the Government's pretrial disclosures included a PowerPoint presentation with two videos Graham prepared to explain the operation of remote-controlled IEDs to the jury. The Government also played a PowerPoint that

Graham prepared to explain to the jury the steps to produce custom-built printed circuit boards.[33]

The SRN was significantly more detailed than what we and other circuits have deemed sufficient to satisfy the operative version of Rule 16. In *United States v. Mendoza-Paz*, we held that a high-level one-paragraph summary of a drug valuation expert's testimony was sufficient to satisfy Rule 16, even though the disclosure was made twelve days before trial. 286 F.3d 1104, 1111 (9th Cir. 2002). The summary in *Mendoza-Paz* listed the agent's "contacts" with various government agencies, criminal organizations, and defendants as the basis for his testimony, and the Government also provided a resume and a written report on which the expert relied upon, in part. *Id.* In *United States v. Lipscomb*, the First Circuit held that a notice was enough when it disclosed that officers would be testifying as experts on the basis of their "training and experience" and that they would "make conclusions regarding the presence of firearms and the connection between the quantity of crack cocaine seized from the defendant and drug distribution, and that those conclusions were based on the officers' experience working in the police department." 539 F.3d 32, 38 (1st Cir. 2008). In reaching that conclusion, the First Circuit observed that Rule 16's goal is to provide "'a fair opportunity to test the merit of the expert's testimony through focused cross-examination'" and emphasized that "the bases for the detectives' conclusions were adequately probed by defense counsel on cross-examination with no

---

[33] The parties stipulated that "numerous DTMF-11 circuit boards were recovered in Iraq from post-blast IED events during the time period 2005 to 2007," and that "based on components, functionality and trace layout, many of these boards were very similar to" a completed DTMF-11 board found at Omar.

particular difficulty." *Id.* (quoting Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment).

Oklah argues that the SRN was defective because it incorporated the Government's prior defective disclosures and several unsigned TEDAC reports that conflicted with Graham's trial testimony. He argues that the SRN continued to incorporate all of the TEDAC reports because it began with a general statement that the Government "incorporates by reference its prior notices" and included a footnote in the section discussing Graham's anticipated testimony that stated, "A more detailed description of the corresponding TEDAC reports from the engineers' area of testimony was previously provided to the defense."

First, we note that defense counsel used the TEDAC reports to impeach Graham's testimony over the course of several days. Defense counsel had the opportunity to conduct, and in fact did conduct, a lengthy and detailed cross-examination. Second, as the district court recognized, neither the SRN nor the previous disclosures stated that Graham agreed with everything contained in the TEDAC reports or that he adopted them as his own opinions. The defense raises nine examples from Graham's testimony that it characterizes as "either undisclosed or directly contrary to the pretrial disclosures," but these examples do not show that the SRN failed to give Oklah adequate notice of Graham's testimony. Despite the highly technical nature of Graham's expert testimony, the disclosures gave defense counsel a fair opportunity to test the merits of Graham's opinions through focused cross-examination. *See* Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment. Defense counsel had access to the relevant TEDAC reports, used them extensively during cross-examination, and leveraged inconsistencies in closing argument.

Oklah also briefly argues that the admission of Graham's testimony violated his right to due process. But the authorities he cites are inapposite. *See United States v. Robinson*, 44 F. Supp. 2d 1345 (N.D. Ga. 1997); *United States v. Tin Yat Chin*, 476 F.3d 144 (2d Cir. 2007).

In *Robinson*, the district court excluded the government's expert's testimony because its initial Rule 16 disclosure was entirely "conclusory" and failed to provide the basis for its expert's opinion, and its untimely amended disclosure was so incomplete that it rendered the defense's expert "unable to review the basis of the [government expert's] opinion." 44 F. Supp. 2d at 1346. By contrast, as explained, the amended disclosure here was sufficient.

In *Tin Yat Chin*, the Second Circuit observed that the government engaged in "sharp practice, unworthy of a representative of the United States" when it did not disclose its intent to call an expert witness to rebut the disclosed testimony of the defense's expert, and the court cautioned that "such an ambush might well violate due process" in an "appropriate case." 476 F.3d at 146 (quoting *Wardius v. Oregon*, 412 U.S. 470, 476 (1973) ("It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State.")). In contrast to *Tin Yat Chin*, Oklah has not alleged that the Government failed to disclose its intent to call Graham.

B. Federal Rule of Evidence 702

Invoking Federal Rule of Evidence 702, Oklah contends that the district court abused its discretion by admitting Graham's expert testimony without first determining whether it was reliable. Under our precedent, a district court

"abdicates its gatekeeping role, and necessarily abuses its discretion, when it makes no reliability findings" for expert testimony, but the district court has "flexibility" in "how to determine reliability." *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020) (emphasis omitted). The reliability inquiry must focus on the basis for the expert's opinion, *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995), which may include "personal knowledge or experience," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). The district court must make its "gatekeeping" findings explicit on the record, and an implicit finding of reliability does not suffice. *United States v. Irons*, 31 F.4th 702, 716 (9th Cir. 2022).

Oklah argues that we should remand to allow the district court to decide whether any of Graham's testimony satisfied Rule 702 because the "district court made no findings as to the reliability of any of [Graham's] opinions set forth in the TEDAC reports." We decline to do so. The TEDAC reports were not offered as a summary of Graham's testimony, nor did the SRN indicate that he adopted all of them. Before trial, the district court acknowledged that Oklah challenged Graham's proposed expert testimony as "not based on reliable information." But after considering Graham's "training, knowledge, and experience, as well as his planned testimony," the district court explicitly overruled Oklah's objection and ruled that Graham's testimony would likely be admissible. After Graham testified at trial, the defense moved to strike Graham's testimony and for a mistrial, and the district court denied the motions. On this record, Oklah has not shown that the district court failed to fulfill its gatekeeping role, which included determining that Graham's testimony was reliable, as required by Rule 702.

Oklah separately contends the district court abused its discretion by admitting Graham's testimony that Omar was "an IED switch factory" because the reliability of this testimony had not been established. We disagree. The district court concluded that Graham had "sufficient familiarity with IEDs" such that he was "qualified to offer opinions regarding the likely intent of the components found at the Omar Street site," and that Graham had "substantial experience working with [IEDs]," making him "qualified to explain to the jury how [IEDs] operate."

Oklah argues that Graham's opinion concerning the purpose of the Omar site was insufficiently supported because Graham did not review the entirety of the evidence that was collected at the site.[34] In making this argument, Oklah analogizes to cases in which the Third, Sixth, and Seventh Circuits have noted that reliable conclusions about statistical data must be based on a representative sample. *See EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 754 (6th Cir. 2014); *DeKoven v. Plaza Assocs.*, 599 F.3d 578, 581 (7th Cir. 2010); *United States v. Dent*, 149 F.3d 180, 190–91 (3d Cir. 1998). Oklah argued to the jury that

---

[34] At the time of the raid, the entire neighborhood around Omar had been abandoned and there were no witnesses arrested who could have provided testimony about the purpose of the operation there. But physical evidence from the site was seized and analyzed at CEXC and TEDAC. This physical evidence included remote-controlled IED switches, and the materials, tools, and components needed to manufacture them. The evidence indicated that IED switches were manufactured on site. Graham's testimony was critical because he explained the function of the components found at Omar, and the parties stipulated that a completed DTMF-11 circuit board found at Omar was "very similar" to "numerous DTMF-11 circuit boards" retrieved after IED attacks.

Graham examined the evidence collected by the U.S. military with "tunnel vision."

The cases Oklah cites are inapt because the challenged testimony here—Graham's impressions of the purpose of the Omar operation based on his background and experience with IEDs—was not a conclusion supported by a data sample. Rather, his impressions were supported by his experience working as a lab manager at CEXC—a DoD laboratory where investigators classified and analyzed evidence collected from explosions that targeted U.S. forces in Iraq; his studies of and conversations with insurgents who built and used IEDs; his review of photographs of the evidence collected at the Omar site; and his examination of the items and documents found there. This evidence and Graham's experience were sufficient to support his conclusion that Omar was an IED switch factory. *See Kumho Tire*, 526 U.S. at 150.

Oklah also argues that Graham gave unreliable testimony that DTMF-11 boards were never sold commercially and lacked a non-IED purpose. This argument fails because it misstates Graham's testimony. Graham testified that the DTMF-11 circuit boards and modified JDQ boards found at Omar were "identical to multiple . . . boards attached to explosives and found at postblast events," and that "DTMF boards were never" documented by CEXC as "being used for any other application than in IEDs" before, during, and for several years after his time at CEXC. This testimony was supported by Graham's own experience at CEXC and his review of evidence seized at Omar. On this record, we conclude the district court did not abuse its discretion when it declined to strike Graham's testimony as unreliable.

## VI. The Absence of James Dempsey at Trial

Oklah argues that the Government's failure to produce James Dempsey as a witness at trial violated his constitutional rights to due and compulsory process, reprising an argument that he made in a post-trial motion. Dempsey was one of three DoD-affiliated witnesses the defense requested the Government's assistance in locating. Documents produced in discovery indicated that Dempsey was part of the Sensitive Site Exploitation (SSE) team that deployed to Omar and collected evidence there. The defense sought Dempsey's testimony because a 2011 interview report documented that Dempsey told an FBI investigator that he "recalled a ledger book" found at Omar that "mentioned the computer shop," and that he "was told the Iraqis learned" Oklah left Omar about a month before the SSE team arrived. The defense anticipated that Dempsey's testimony would have corroborated its theory that Oklah ran a legitimate electronics business in Iraq before leaving for China and that the items found at Omar comprised the abandoned inventory from his business.

We review de novo whether a constitutional violation occurred because the Government did not produce Dempsey, *United States v. Bahamonde*, 445 F.3d 1225, 1228 n.2 (9th Cir. 2006), but review for clear error the district court's factual findings underlying its decision to deny the motion to dismiss, *United States v. Velarde-Gavarrete*, 975 F.2d 672, 674 (9th Cir. 1992). The Compulsory Process Clause and the Due Process Clause both guarantee "a meaningful opportunity to present a complete defense." *United States v. Stever*, 603 F.3d 747, 755 (9th Cir. 2010) (citation omitted). Although "criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial," *Ritchie*, 480 U.S. at 56, "the

Government is under no obligation to look for a defendant's witnesses, in the absence of a showing that such witnesses were made unavailable through the suggestion, procurement, or negligence of the Government," *United States v. Ballesteros-Acuna*, 527 F.2d 928, 930 (9th Cir. 1975) (internal quotation marks and citation omitted).[35]

In an attempt to satisfy this standard, Oklah accuses the Government of "hiding" Dempsey. But the record does not support this contention. The Government initially identified Dempsey only as a "Cooperating Source (CS)," but it disclosed Dempsey's name to the defense more than seven months before trial, on June 14, 2017. Three months later, on September 12, 2017, defense counsel emailed a subpoena for several witnesses, including Dempsey, to DoD. Oklah does not explain why DoD was expected to serve the subpoena on his behalf. We have not identified any authority that required DoD to do so. *See* 32 C.F.R. § 257.4 (explaining that "[i]t is DoD policy to accept service of process directed to the Secretary of Defense or a Secretary of a Military Department in his official capacity," but making no reference to other DoD personnel).[36] In addition,

---

[35] When a defendant seeks the testimony of an eyewitness to the "actions" or "offenses" charged in an indictment whom the government does not intend to call, the court may presume that the witness's testimony would be favorable. *United States v. Cadet*, 727 F.2d 1453, 1469 (9th Cir. 1984). Because Dempsey did not witness the "actions" or "offenses" charged in the indictment—Oklah's participation in the Brigades' conspiracy—*Cadet* does not apply.

[36] A DoD deputy general counsel declared that he was "not aware of any DoD policy or directive that authorizes DoD to accept service of process."

(cont.)

defense counsel did not seek to have the subpoenas served by any approved means, such as by the U.S. Marshal.**[37]**

In the district court, defense counsel argued that because the defense "understood that the Government was fulfilling their obligation to find and bring James Dempsey to court," defense counsel decided not to bring the issue to the attention of the Government or the court until two weeks before filing Oklah's motion to dismiss. It was not until several weeks after the trial began that defense counsel first informed the Government that it was having difficulty locating three witnesses, including Dempsey. The Government promptly attempted to contact these witnesses, and two of the three wound up testifying at trial. The Government stated that an FBI agent also tried to contact Dempsey through each of the telephone numbers and email addresses it had on file, but it was unable to reach Dempsey. Those facts do not support an inference that government suggestion, procurement, or negligence caused Dempsey's absence at trial.

Oklah also argues that Dempsey was a confidential informant, triggering a duty for the Government to use reasonable efforts to produce him to testify at trial. *See*

---

In the district court, Oklah invoked Department of Defense Directive 5405.2, but this DoD policy explicitly states that it "is intended only to provide guidance for the internal operation of the Department of Defense and is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law against the United States or the Department of Defense." 32 C.F.R. Pt. 516, App. C(B)(6).

[37] *See* U.S. Marshals Serv., *Subpoenas*, https://www.usmarshals.gov/what-we-do/prisoners/operation/prisoner-guideline/subpoenas [https://perma.cc/5Y4A-6SSL] (explaining that "[t]he United States Marshal . . . serves subpoenas . . . for defendants of public defenders").

*United States v. Montgomery*, 998 F.2d 1468, 1476 (9th Cir. 1993) (articulating the government's heightened obligation to use "reasonable efforts" to produce a witness to testify at trial if the witness served as a confidential informant). This argument fails for two independent reasons.

First, as the district court recognized, Dempsey was "not a confidential informant." The record does not show that the Government was "trying to maintain . . . the secrecy of the source," and it is uncontested that the Government provided Dempsey's name to the defense well before trial. In fact, the defense sought Dempsey's testimony for the sole purpose of following up on a 2011 interview report documenting that Dempsey told an FBI investigator about the ledger book found at Omar and that Dempsey had been told by an unidentified third party that Oklah had left Omar about a month before the raid. The Government represented to the court that it protected Dempsey's identity as an accommodation to avoid adversely affecting his employment at DoD, not as a means of concealing the source of his testimony from the defense. *See United States v. Black*, 767 F.2d 1334, 1337 (9th Cir. 1985) ("The defendant's right of access is not violated when a witness chooses voluntarily not to be interviewed."). In any case, by the time the defense asked for help, six years had passed since Dempsey's interview. Although the Government was not required to disclose Dempsey's identity before trial, *see United States v. Bonilla*, 615 F.2d 1262, 1264 (9th Cir. 1980) (per curiam), it nevertheless did so seven months in advance.

Second, even if Dempsey could be viewed as a confidential informant, Oklah's due process argument would fail because the district court's finding, that "the government tried and did everything they could to find [Dempsey]," was not clearly erroneous. That finding, and the Government's

successful efforts to secure the testimony of the other two witnesses at the last minute, support the district court's conclusion that the Government made "reasonable efforts" to secure Dempsey's testimony.[38]  We conclude that the district court did not err by denying Oklah's motion to dismiss based on the Government's failure to produce James Dempsey.

VII.    Department of Defense Search

On appeal, Oklah renews his *Brady* argument arising from the district court's refusal to order the Government to search the entire Department of Defense for relevant documents.

Three days before trial, the defense requested that the Government turn over all information indicating that: (1) the Brigades were fighting anyone other than the U.S. military; (2) the Brigades were assisting American forces; or (3) American military forces had paid the Brigades for assistance.  The Government refused this request, arguing

---

[38] *See Montgomery*, 998 F.2d at 1473 ("Courts typically find the government's efforts to secure the presence of a confidential informant unreasonable when the government acts with negligence or intentional avoidance."); *see also United States v. Burt*, 76 F.3d 1064, 1067 (9th Cir. 1996) (noting reasonable efforts where the Government contacted people who knew the witness, tried all her telephone numbers, but failed to locate her), *reh'g granted, opinion withdrawn on other grounds*, 83 F.3d 1156 (9th Cir. 1996); *United States v. Suarez*, 939 F.2d 929, 932 (11th Cir. 1991) (finding no duty for the government to produce a confidential informant at trial who could not be located "after [a] diligent search"); *Fitzpatrick v. Procunier*, 750 F.2d 473, 476 (5th Cir. 1985) (same); *United States v. Hart*, 546 F.2d 798, 799–800 (9th Cir. 1976) (en banc) (finding reasonable efforts where the government told DEA informants that they must be present for trial "in very strong terms" but failed to detain them as material witnesses).

that it was both overbroad and untimely. Over the Government's objection, the district court ordered the Government to search for the requested information and provide a written response because the court deemed it relevant to Oklah's theory that he may have been aligned with a subset of the Brigades that had not targeted Americans.

Two weeks into trial, the Government made a responsive disclosure, explaining that it had searched FBI records, records from the U.S. Attorney's Office, and DoD databases to which the U.S. Attorney's Office had access. The Government also reported contacting U.S. Central Command (CENTCOM), the military authority for U.S. forces in the Middle East and parts of Africa, Asia, and the Indian Ocean. The Government later relayed that it was told the request would require a search of all DoD holdings, including several DoD subcomponents, followed by filtering, review, and declassification.

Defense counsel filed a motion to compel the search the Government had described. The Government opposed. The Government explained that it searched the DoD databases on which it primarily relied for its investigation, including: (1) the CEXC-Iraq website, which had been archived after CEXC was disbanded in 2010; (2) the Combined Information Data Network Exchange database, which is a database developed for theater-wide use in Iraq and Afghanistan; and (3) the U.S. Army National Ground Intelligence Center, which is DoD's "primary producer of ground forces intelligence." As to the requests the Government directed to CENTCOM, the Government represented that CENTCOM "is not an investigative agency," but in response to Oklah's discovery requests, the Government had from time to time "queried CENTCOM for

documents that could not be located" on the databases to which the Government had access.

The district court denied Oklah's motion in an oral ruling. The court held that, although the Government had an ongoing responsibility under *Brady* to determine whether there was reason to believe the requested information could be found within CENTCOM, there was no basis for concluding that the Government had an obligation to search CENTCOM, "particularly if [the Government] ha[d] to get approval [to] do so." The court also ordered the Government to explain to the defense "exactly, in writing, what CENTCOM is and why [the Government] searched it" on earlier occasions or why a further search would be "burdensome."

Under *Brady*, the Government must produce to the defense exculpatory or impeaching evidence in the prosecutor's possession. *See Bagley*, 473 U.S. at 675–77. Information is in the prosecutor's "possession" if it is held by members of the prosecution team, such as investigating agents, or if it is held by other executive branch agencies and the prosecutor has "knowledge of and access to" the evidence. *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989); *see Kyles*, 514 U.S. at 437–38. The prosecutor is deemed to have "knowledge" not only of information that the prosecutor personally knows, but also of information that the prosecutor "could have learned." *United States v. Cano*, 934 F.3d 1002, 1023 (9th Cir. 2019) (quoting *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc)). "The prosecutor will be deemed to have knowledge of and access to anything in the possession, custody or control of any federal agency participating in the same investigation of the defendant." *Bryan*, 868 F.2d at 1036. As to those agencies that are not involved in the investigation, the "prosecutor

need not comb the files of every federal agency which might have documents"; rather, the obligation to disclose "turn[s] on the extent to which the prosecutor has knowledge of and access to the documents." *United States v. Zuno-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995) (quoting *Bryan*, 868 F.2d at 1036).

Oklah argues that the Government was obligated to search the entirety of DoD because DoD participated in the investigation of the Brigades and because the prosecutor had "knowledge of and access to" the requested DoD documents. We are not persuaded that the Government failed to meet its *Brady* obligations. Oklah's arguments conflate the DoD components that participated in the investigation with the entirety of DoD.

In *Cano*, we concluded that the FBI and the DEA were outside of the investigating team for a criminal prosecution that had been investigated and initiated by Homeland Security Investigations, notwithstanding the fact that the FBI and DEA, like the prosecuting U.S. Attorney's Office, were components of the Department of Justice. *Cano*, 934 F.3d at 1024. DoD is the largest agency in the U.S. government, overseeing 3.4 million service members and civilians. *About*, U.S. Dep't of Def., https://perma.cc/99P4-RNWX (last visited Jan. 23, 2023). It comprises 33 agencies and subcomponents. *See, e.g.*, *DoD Employers*, DoD Civilian Careers, https://perma.cc/8J8X-JD6J (last visited Jan. 23, 2023). Oklah's suggestion that DoD, as a whole, was a "participating agency" cannot be squared with our conclusion in *Cano*.

We apply a "case-by-case approach" to determine whether the prosecution had the requisite knowledge and access. *Cano*, 934 F.3d at 1025. Under the circumstances

of this case, we hold that the Government did not have "access to" the entirety of DoD merely because it had the ability to send queries to CENTCOM. First, CENTCOM told the prosecution that Oklah's request would require a search of nothing less than *all* DoD components. That fact suggests that CENTCOM could not readily produce responsive documents. Oklah also fails to rebut the Government's showing that it had access only to those databases directly related to Oklah's prosecution, that DoD did not affirmatively grant the prosecution team access to the many databases and sources of information that Oklah wanted the Government to search, and that the prosecution team was relegated to requesting CENTCOM's assistance to obtain any responsive materials. *See Bryan*, 868 F.2d at 1036 ("[G]iving 'government' its broadest reading by expanding it to include all federal agencies (such as the IRS) would not only wreak havoc, but would give the defense access to information not readily available to the prosecution." (alteration in original) (citation omitted)).

Finally, our court has recognized that non-participating agencies may have valid concerns over revealing sensitive information in cases wholly unrelated to the agencies' own area of expertise, and "the agencies may be reluctant to cooperate in a particular investigation if it means opening their files in other investigations." *Cano*, 934 F.3d at 1025. The latter concern applies here because a significant amount of discovery was subject to the CIPA process.

"[A] federal prosecutor need not comb the files of every federal agency which might have documents regarding the defendant in order to fulfill his or her obligations . . . ." *Bryan*, 868 F.2d at 1036. We conclude that the

Government's decision not to order a full search of CENTCOM's databases did not violate *Brady*.**[39]**

VIII.    Reassignment on Remand

Remand for resentencing is warranted because the parties agree that the convictions on Counts Three and Four must be vacated in the wake of the Supreme Court's decision in *Davis*. *See* 139 S. Ct. at 2336. Oklah argues that this case should be reassigned to a different district judge on remand. We disagree. The standard for reassignment on remand is demanding, and "[a]bsent unusual circumstances, resentencing is to be done by the original sentencing judge." *United States v. Acosta-Chavez*, 727 F.3d 903, 910 (9th Cir. 2013) (alteration in original) (quoting *United States v. Waknine*, 543 F.3d 546, 560 (9th Cir. 2008)). To determine whether reassignment is appropriate, we consider:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or

---

[39] Months after this case was submitted for decision, defense counsel submitted a letter pursuant to Fed. R. App. P. 28(j) and a related motion for judicial notice discussing documents that counsel had recently discovered and arguing that these documents are material to the defense's *Brady* arguments. We grant the motion for judicial notice, but none of the documents identified by the defense changes our analysis of these issues. The scope of a prosecutor's search obligations turns on her "knowledge of and access to" the relevant evidence, *Bryan*, 868 F.2d at 1036, and the documents identified in the defense letter and motion do not rebut the Government's showing that it searched all DoD databases to which it had access and that it was relegated to requesting CENTCOM's assistance for any additional responsive materials. Oklah thus failed to show that the Government's failure to search CENTCOM violated his rights under *Brady*.

> findings determined to be erroneous or based
> on evidence that must be rejected, (2)
> whether reassignment is advisable to
> preserve the appearance of justice, and (3)
> whether reassignment would entail waste and
> duplication out of proportion to any gain in
> preserving [the] appearance of fairness.

*United States v. Walker River Irrigation Dist.*, 890 F.3d 1161, 1173 (9th Cir. 2018) (quoting *United States v. Rivera*, 682 F.3d 1223, 1237 (9th Cir. 2012)).

The 18 U.S.C. § 924(c) and (o) convictions in Counts Three and Four were predicated on the conspiracies charged in Counts One and Two. These qualified as "crimes of violence" only pursuant to the statute's residual clause, which the Supreme Court invalidated as unconstitutionally vague approximately two years after the district court entered judgment in this case. *See Davis*, 139 S. Ct. at 2336. The district court denied Oklah's pretrial motion to dismiss Counts Three and Four. It also denied Oklah's renewed motion to dismiss those counts, which Oklah made after trial. Although Oklah's motion to dismiss relied on the same arguments that the Supreme Court embraced in *Davis*, this is the only reversible error we identify in the district court's rulings.

Oklah points to other isolated statements and rulings to support his arguments that the district court failed to familiarize itself adequately with the record, subjected the parties to different rules, and facilitated improper ex parte communications. We disagree. The record in this case spans nearly fifteen years, the work of two district judges and trial teams, hundreds of exhibits, and tens of thousands of pages of trial submissions. The trial alone took almost two months.

Those months certainly included long days for all concerned. Our review of the record demonstrates that the district court was thorough, careful, and fair. In a trial like this one, small mistakes here and there are inevitable. But absent unusual circumstances, they are not grounds for ordering a case reassigned on remand. We reject Oklah's contention that the district court's handling of the case was unfair or biased. The objections that Oklah lodges fall far below the standard for reassignment to a new judge. Oklah has not shown that our ordinary practice of remanding to the sentencing judge would create an appearance of unfairness, or that reassignment would not entail waste or duplication.

## Conclusion

This case demonstrates the importance of and the challenges inherent in prosecuting foreign nationals for violent acts perpetrated against the United States abroad. Federal courts can handle these prosecutions in public proceedings that are fair and efficient, but such cases raise complicated questions about jurisdiction and extraterritoriality, classified information, witness availability, expert testimony, and discovery. Reviewing Oklah's many arguments, we remain mindful that our laws and Constitution apply to this case just as they do to all direct criminal appeals. *See Boumediene v. Bush*, 553 U.S. 723, 798 (2008) ("Liberty and security can be reconciled; and in our system they are reconciled within the framework of the law.").

We affirm Oklah's convictions on Counts One and Two, reverse his convictions on Counts Three and Four, and

remand to the district court for proceedings consistent with this opinion.[40]

**AFFIRMED in part; REVERSED and REMANDED in part.**

---

[40] Each party shall bear its own costs on appeal. *See* Fed. R. App. P. 39(a)(4).